**UNITED STATES, Appellee,**

v.

**Donald GAMBLE, First Lieutenant U.S. Army, Appellant.**

No. 54,258.
CM 445349.

U.S. Court of Military Appeals.

Dec. 6, 1988.

For Appellant: *Captain Donna L. Wilkins* (argued); *Colonel Brooks B. La Grua, Lieutenant Colonel Paul J. Luedtke, Major Joel D. Miller, Captain H. Alan Pell, Captain Kathleen Vander Boom* (on brief).

For Appellee: *Captain Kathy J.M. Peluso* (argued); *Colonel Norman G. Cooper, Lieutenant Colonel Gary F. Roberson, Lieutenant Colonel Larry D. Williams, Captain Thomas L. Herrington* (on brief); *Colonel James Kucera* and *Lieutenant Colonel Adrian J. Gravelle.*

*Opinion of the Court*

EVERETT, Chief Judge:

At Lieutenant Gamble's general court-martial before members for rape, forcible sodomy, and conduct unbecoming an offi-

cer by wrongfully having sexual intercourse with a soldier's fiancée,[1] the adversarial spotlight quite clearly focused on the question: Did she consent? To prove lack of consent, the prosecution successfully sought to introduce testimony regarding a prior act of uncharged sexual misconduct by Gamble. In so doing, it raised evidentiary issues now before us for review. Also, the defense claims that the military judge erred in not instructing on mistake of fact as a defense. 22 MJ 334.

We conclude that the challenged evidence was not relevant for the purposes urged by the Government at trial and in this Court; that the relevance, if it did exist, was substantially outweighed by a danger of unfair prejudice, *see* Mil.R.Evid 403 and 404(b), Manual for Courts-Martial, United States, 1969 (Revised edition); that, under the circumstances of this case, appellant's *in limine* challenge to the evidence preserved his appellate claim; and that the judge prejudicially erred in failing to give an instruction on mistake of fact.

## I

### A

Ms. Coghlan,[2] an Irish national, had lived in Kriegenbrunn, Federal Republic of Germany, with her fiancé, an American soldier, for nearly a year before the events giving rise to this trial. One day when she went to a laundromat at Ferris Barracks to do their laundry, she met Gamble. In the ensuing conversation, Gamble learned that Coghlan was not authorized to use the facilities, but he promised he would not report her to the authorities.

It was raining by the time Coghlan had completed her laundry, so she accepted Gamble's offer to drive her back to her apartment. There, they talked for a while, and—although she had told Gamble about her fiancé—she gave him her telephone number before he left "so we could get together and have a coffee and talk."

About 6:00 that evening, Gamble called Coghlan to invite her to jog with him. She declined, but she did accept his invitation to go to the Erlangen beer festival at 9:00 that night. Later, however, Coghlan talked by telephone with her fiancé, who was quite angry about her plans with Gamble. Although Coghlan was not happy about her fiancé's reaction, she did agree to break the date. Thus, when Gamble called her at 8:00, she told him that she could not accompany him after all. She did agree, though, to allow him to visit her later that night.

About midnight—after Coghlan thought that Gamble would not appear—he called her and asked if he could come over. She agreed, got dressed, and made some coffee. About an hour after his call, Gamble arrived, carrying a bottle of wine. They opened the bottle and talked. Gamble told her that he was extremely depressed and lonely over recently breaking up with his girl friend and that he just wanted someone to embrace.

At this point, Coghlan's and Gamble's version of events take separate tracks. The prosecution evidence indicates that Gamble asked Coghlan several times to hold him but that she refused each time. She also refused his request to change into a dressing gown. When she rebuffed Gamble's attempt to embrace her, he grabbed her by the wrist, led her to the bed, and pinned her there. Gamble told Coghlan that he did not want to force her, but she pointed out that he was doing just that. When she tried to scream, he pushed his hands—and then a pillow—into her face to muffle the sound. During the struggle, she broke a chain hanging from Gamble's

1. *See* Arts. 120, 125, and 133, Uniform Code of Military Justice, 10 U.S.C. §§ 920, 925, and 933, respectively. Gamble was convicted of these charges and sentenced to dismissal, confinement for 25 years, and total forfeitures. The convening authority approved these results. Because of multiplicity with the rape charge, the offense of conduct unbecoming an officer was dismissed by the Court of Military Review, which otherwise affirmed the findings and sentence.

2. Her name is misspelled on the charge sheet and the promulgating order.

neck, and he insisted that she apologize for breaking the $100 chain. When he pushed down on Coghlan's chin with his hand, he cut her lip, and she then ended all resistance. Gamble wiped the blood from her mouth with a towel, and Coghlan drank a glass of wine. Sexual intercourse and fellatio ensued.

Afterwards, Gamble fell asleep on Coghlan's bed, and she decided to leave the apartment. Having no money, she took some from Gamble's shirtpocket and departed; but she left him a note to explain that she had taken some money for a taxi. Coghlan went to a local hotel, drank some coffee, and reported the incident to the police.

A doctor who examined her later that day found several fresh injuries—including a cut on her lip, scratches on her shoulder blade and neck, some reddened areas on the left arm which appeared to be from bites, and a reddened area on her right shoulder. He opined that these injuries were "proof of considerable application of force"—"force that would by far exceed a usual love play." A dentist examined Coghlan's teeth and discovered that two of them had been loosened slightly and that her lip had a minor laceration and contusion.

On the other hand, Gamble asserted that, when he arrived at Coghlan's apartment late on the night in question, she answered the door wearing only a T-shirt and underwear, though later she did put on some pants. He said that "she was trying to come on to me." They talked briefly, then kissed and caressed each other, and finally engaged in consensual intercourse and oral sex. Afterwards, he fell asleep, and the next morning he went to a neighbor's home to borrow some toothpaste.

Explaining Coghlan's injuries, he said that she clumsily hurt herself while they were undressing and while changing positions during intercourse. He asserted that the bruises were "passion mark[s]," not bites, and he hypothesized that the scratches around her neck might have been caused by movement of some jagged edges of the clasp of the chain around his neck during intercourse. As for his chain, he urged that it had come off because its clasp was loose, not because Coghlan had torn it off.

Identifying a possible motive for Coghlan to lie about this incident, Gamble explained that, before intercourse, she had told him that she was not using any method of contraception, so he had promised to withdraw before ejaculating. However, he broke his promise—which made Coghlan very nervous because she feared she might become pregnant and might not be able to explain the pregnancy to her fiancé.

### B

Before trial, the defense moved *in limine* to exclude the expected testimony of Sergeant Debbie Gant concerning a prior, unrelated, uncharged incident. In his written motion, defense counsel revealed that he expected that Gant would testify that the accused had committed an indecent assault on her approximately 8 months earlier.

He urged several bases for his motion. First, counsel argued that, under the guise of Mil.R.Evid. 404(b), trial counsel really was trying—in violation of Mil.R.Evid. 404(a)—"to show that" Gamble "has a disposition to commit certain criminal acts in a particular manner and time" and, therefore, had probably committed the crime charged. Counsel also contended that the "allegation lack[ed] a nexus in time, place, and circumstance with the" charged offense as was necessary under Mil.R.Evid. 404(b) and that the evidence of "the uncharged misconduct" was "not plain, clear, and conclusive." Anticipating that the prosecution would urge that Gant's testimony would show a modus operandi similar to the charged offense, defense counsel labeled such an effort a "pretext": He argued that the two incidents were entirely "dissimilar" and that "[a] particular scheme is totally lacking." Finally, pointing to Mil.R.Evid. 403, counsel submitted that, even if the evidence were relevant, its probative value was substantially outweighed by the danger of unfair prejudice.

In considering the motion, the military judge had before him the sworn statement made by Gant to investigators shortly before Gamble's trial. Therein, she explained that, on one Saturday afternoon nearly 8 months before, she was working her normal shift in the message center when Gamble, who was the staff duty officer that day, entered the locked room. Once in the room, Gamble sat down and engaged Gant in casual conversation, urging her to "go back to college" and to apply for Officer Candidate School. As the conversation progressed, he asked Gant whether she "had ever had an affair." When she answered that she did not do such things because she "was a Christian," he responded "that he knew a lot of Christians" who "have affairs." As he was talking, he began walking toward the door, so Gant thought he was preparing to leave. She followed closely behind in order to "secure the door" behind him. However, when he reached the door, "he turned around, ... grabbed" her "by the shoulders with both of his hands, and" walked her "backward[s] to a table ... a short distance" away. She told "him to stop" and feared that he might rape her. He leaned her "slightly" back, over the table, and said that "he just wanted to touch" her. Quickly, he unzipped her fatigue pants, "reached his hand inside," and touched her vagina on the outside of her underwear. Throughout, she told "him to stop and" tried "to push him away," but "he was much bigger than" she. After a short time, for some unknown reason, Gamble stopped and removed his hand. When she "told him that he did not even know" her and that she "could report him[, h]e asked" her "not to." Finally, he left.

When queried by the military judge regarding the purpose of the evidence, trial counsel indicated that it would "show intent, plan, preparation, [and] absence of mistake" relating to the alleged rape and forcible sodomy of Coghlan. He urged "that, although the exact same offense is not involved, the offenses are both forceful in nature, they are both sexual in nature,

and ... the accused's behavior, just prior to the offenses, is extremely similar."

Amplifying on the purported similarity of Gamble's behavior before each incident, trial counsel argued:

[T]he Government would argue that you will notice that Lieutenant Gamble approached both the women by getting in a position where he was alone with them. And, secondly, he struck up a general, polite conversation with them. And the Government would argue that it is actually beyond polite; that elements of the conversations, spoken by the accused, would go very far to disarm any possible suspicions or thoughts that the girls might have had toward the accused's intent—in the conversation and in the relationship; and that in the Gant situation, bringing up OCS, the possibility of this enlisted person attending Officers Candidate School—she ought to consider it; she's intelligent. What more could convince her that Lieutenant Gamble is purely interested in her as a person and interested in her career? What more could dispel any suspicious thoughts of hers [sic] toward him? In the Coghlan situation, it was talking to Miss Coghlan about her fiancé, stating that he thought he knew her fiancé, asking to see a picture of her fiancé, talking of his own girlfriend—a German girlfriend; speaking of his relationship with his girlfriend. Again, what more could dispel any thoughts of suspicion than to sit there and talk about one another's respective boyfriends and girlfriends? And the government would maintain that, in both cases, at a point the accused brought the conversation around to sexual type matters. In the Gant situation, he began talking about people having affairs with one another and eventually pointed the question at Sergeant Gant—whether she did. In the Coghlan situation, he started talking about difficulties that he was having with his girlfriend and the fact that they were probably going to break up and he was depressed and he wanted somebody to put their arms around him—asking for sympathy

that way. In the Gant situation, when he finally brought the questions around to her, in a pointed manner, she stated, no, she didn't have affairs; she didn't do that type of thing. Lieutenant Gamble eventually started to leave but, on his way out, spun around and perpetrated the forceful act at that point. In the Coghlan situation, when Miss Coghlan refused to comfort him physically—to put her arms around him and so on and so forth—and continued to refuse this—then the accused acted and engaged in the alleged forcible behavior. The government would just urge that the similarity is very close and it is definitely relevant evidence to show the accused, that his intent, when he got to Miss Coghlan's house—that he had a plan—. that he was prepared to act in a certain way; it wasn't just a spontaneous sequence of events.

The defense replied that, while there were "big similarities, ... they are similarities that you would see just with the nature of the offense—sexual offense—small talk leading up to a supposed act of violence—in a general way, period." In other words, counsel urged that they were "similarities which just go to probably any sexual assault. Beyond that, I don't think they're similar at all."

Ultimately, the military judge denied the motion and ruled that the testimony would be admitted to show Gamble's intent and modus operandi. He explained:

As to the motion pertaining to the uncharged misconduct with Sergeant Gant, I find, by clear and convincing evidence, that there is a nexus of time of approximately two months between the uncharged misconduct and the charged misconduct; a nexus of place: Erlangen; a nexus of similarity of circumstances to the effect of the alleged perpetrator working up the victim by smooth talking and, eventually, resolving [sic] to a degree of force to attempt to accomplish his aim: sexual relations. I further find, the uncharged misconduct is plain, clear, and conclusive. I find that, on balance,

the probativeness of the uncharged misconduct outweighs its prejudicial impact and the evidence—that is, the testimony of uncharged misconduct with respect to Sergeant Gant—may be presented to the jury to show intent and plan or design, that is, a modus operandi on the part of the accused, to the offense charged, that is, only the rape alleged in Charge I, the Specification thereto; and the other offenses connected with Nollaig Coghlan, occurring on 20 May 1983. It may not be used for any purpose, whatsoever, otherwise. The Government advocated presenting this statement to show the accused's consciousness of guilt of the offense charged. Not permissible.

During trial, Gant testified substantially in accord with her sworn statement. At no time during the trial, however, did defense counsel renew his objection to her testimony. In line with his ruling on the motion *in limine*, the military judge instructed the members that Gant's testimony was limited to showing Gamble's "modus operandi" of approaching women "which may have been followed by force when that was not successful in obtaining sexual relations."

During his closing argument, trial counsel quite clearly relied significantly on Gant's testimony:

And his M O, gentlemen, the M O he used with Miss Coghlan is corroborated to you by the testimony of Sergeant Gant. Same sequence. Start out with polite conversation, but it's a lot more than polite conversation. It's conversation that's going to put the other person completely at ease. Just wipe out any possible suspicion that they would have about this man and his intentions. What was he talking to Gant about? About she ought to go to OCS, Officer's Candidate School. She ought to think about that. Now, gentlemen, what is more going to make an enlisted person think that you are just a super guy, and a super gentleman, and just so concerned with their career, than to start talking with them about that kind of stuff. With Coghlan? What more is going to cause a

girl, who has a fiancé, to completely relax than to sit there and ask her questions about her fiancé, and then talk about his girlfriend. Any possible— any—any resident suspicions are gone. It's like people getting together and talking about one another's spouses, you know, it doesn't—that doesn't make for the start of an affair. And in both cases, he brings the conversation around, in some method, to sexual matters. With Gant, he was starting to talk about people having affairs with one another. You saw Sergeant Gant on the stand, and if that isn't a sensitive, timid, quiet woman, the government doesn't know what is. Just one look at her, and any thoughts that this woman is a streetwalker, or a high timer, just disappears.

With Coghlan what'd he start talking about? His problems with his girlfriend. The relationship was bad. The relationship was over. He needed somebody to comfort him. With Gant he brings it around to whether she has affairs or not. And in both cases when he gets to the point, the basic throwing out the line with the bait, with Coghlan, "I need sombody to put their arms around me." "I just need the comfort." With Gant, you know, "Do you have affairs?" "Do you mess around[?]" When that bait is not taken; FORCE! That's the M O in both cases.

(Trial counsel hits his left hand with his right fist.)

## II

Mil.R.Evid. 404(a) directs that, with certain exceptions, "[e]vidence of a person's character or a trait of a person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion." More specifically, Mil.R.Evid. 404(b) prescribes that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." However, subsection (b) does recognize instances in which "[e]vidence of other crimes, wrongs or acts" might "be admissible for other [legitimate] purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

From time to time in cases we review, the prosecution has sought to admit evidence of prior, uncharged misconduct of the accused for one of the purposes listed in Mil.R.Evid. 404(b) or for some other limited purpose akin to those listed. Inevitably, the defense has countered that the purported basis of admissibility is a sham. Continuing with its argument, the defense has urged that, in reality, the evidence paints the character of the accused in a bad light and, thus, invites the inference by the members that the accused acted in conformity with that character and committed the charged crimes.

Since there is merit to both sides of this argument,

[i]t is no wonder that subdivision (b) is so heavily litigated in federal and military courts. Any time the prosecution attempts to offer other acts of the accused as part of its substantive proof there is a very real problem of prejudice. *See United ed States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 920 [99 S.Ct. 1244, 59 L.Ed.2d 472] (1979). These other acts ordinarily involve some kind of wrongdoing or misbehavior. No matter how carefully the court-members are instructed that the evidence is not to be used for a determination of whether the accused is a good or bad person, there is a possibility of misuse. The worse the act, the greater the chance that court-members may lose sympathy for the accused and decide against him because he is a bad person— something that the law does not allow.

S. Saltzburg, L. Schinasi, and D. Schleuter, *Military Rules of Evidence Manual* (hereafter Saltzburg) 361 (2d ed. 1986), Editorial Comment to Mil.R.Evid. 404(b).

The same commentators have observed:

It is common for the prosecution to use short-hand expressions like modus operandi, common plan or scheme, etc., to

account for an offer of evidence of other acts. A trial judge must be certain to make the prosecution state exactly what issue it is trying to prove in order to see whether the evidence is probative, how probative it is, and whether it should be admitted in light of the other evidence in the case and the ever present danger of prejudice.

*Id.* at 362 (footnote omitted).

Similarly, this Court has cautioned that we do not approve "of broad talismanic incantations of words such as intent, plan, or modus operandi, to secure the admission of evidence of other crimes or acts by an accused at a court-martial under Mil.R. Evid. 404(b)"; and we have expressed "concern ... with the dangers in admitting such evidence even if it meets the requirements of Mil.R.Evid. 404(b). *See* Mil.R. Evid. 403," *United States v. Brannan*, 18 MJ 181, 185 (CMA 1984).

In this case, the military judge initially ruled that the challenged evidence was admissible "to show intent and plan or design, that is, a modus operandi." Then, he advised the court members that Sergeant Gant's testimony was to be considered for the sole purpose of showing modus operandi—which he explained as "a method of operations ... in as much [sic] the accused had an approach with women, dealing with them which may have been followed by force when that was not successful in obtaining sexual relations." The Court of Military Review affirmed the judge's ruling on the grounds that the evidence had probative value in showing Gamble's "method of operation or plan." Unpub. op. at 3.

With respect to "intent" as a justification for admission of evidence pursuant to Mil. R.Evid. 404(b), the authors of the *Military Rules of Evidence Manual* comment:

In many cases intent will be an element of the government's case, but the kind of act that the accused committed is almost always an intentional act. In such a case, it is wise for the court to decline to admit evidence of other acts to prove intent until the defendant has an opportunity to put on evidence. *See, e.g.,*

*United States v. Brunson*, 549 F.2d 348 (5th Cir.), *cert. denied*, 434 U.S. 842 [98 S.Ct. 140, 54 L.Ed.2d 107] (1977); *United States v. Danzey*, 594 F.2d 905 (2d Cir. 1979). If the defendant challenges intent, then on rebuttal the prosecution can offer the evidence of the other acts. Where intent is more clearly in issue in a case, evidence of other crimes need not be held in reserve. *See, e.g., United States v. Juarez*, 561 F.2d 65 (7th Cir. 1977).

Saltzburg, *supra* at 362.

■ Of course, in this case, the chief defense was that Coghlan had consented to Gamble's sexual advances, and little attention was paid to appellant's intent. Thus, the point made in *United States v. Woolery*, 5 MJ 31, 33 (CMA 1978), must be remembered:

When the only issue at a trial on a charge of rape is whether the sexual act was with the consent of the alleged victim, evidence of an uncharged rape is not admissible. *Lovely v. United States*, 169 F.2d 386 (4th Cir.1948). The reason is that "[t]he fact that one woman was raped ... has no tendency to prove that another woman did not consent." *Id.* at 390. This is not to say that other acts of sexual misconduct are never admissible. On the contrary, they may be relevant on such issues as the identity of the assailant, his motive or his intent. *See* 22A C.J.S. Criminal Law § 691 (37); 65 Am. Jur.2d, Rape § 71 (1972). But the question of consent focuses on the woman, not the alleged offender, and the agreement or nonagreement of a woman in one encounter does not cast light on the probability of agreement or disagreement by another woman at a different time and under different circumstances.

Certainly, denial of consent by Sergeant Gant would have no relevance in deciding whether Ms. Coghlan also denied consent; and also we doubt that the evidence about the encounter with Sergeant Gant had much relevance in proving Gamble's "in-

tent" during the incident with Coghlan.[3] Apparently, the military judge ultimately came to the same conclusion, for his instructions to the court members limited them to consideration of this evidence solely as it related to modus operandi.

In *United States v. Rappaport*, 22 MJ 445, 446–47 (CMA 1986), we remarked that a distinctive technique employed by the accused in his sexual encounters might be relevant to show that all offenses were perpetrated by the same man. As there was no question of identity, however, it is doubtful whether evidence of modus operandi was relevant. *See United States v. Woods*, 613 F.2d 629 (6th Cir.), *cert. denied*, 446 U.S. 920, 100 S.Ct. 1856, 64 L.Ed.2d 275 (1980); *United States v. Silva*, 580 F.2d 144 (5th Cir. 1978); *People v. Tassell*, 36 Cal.3d 77, 201 Cal.Rptr. 567, 679 P.2d 1 (1984).

In the case at bar, there also was no issue as to identity since there was no dispute that Gamble was the person who had intercourse with Coghlan. Furthermore, the label of modus operandi should not be affixed too readily. We agree with appellate defense counsel that, "to be admissible to prove modus operandi, a high degree of similarity between the extrinsic offense and the charged offense is required. The offense must be so similar in physical characteristics as to constitute being like a signature marking the offense as 'the handiwork of the accused.' *United States v. Beechum*, 582 F.2d 898, 912 n. 15 (5th Cir. 1978) [ (en banc) ], *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979)." Final Brief at 7. *See also United States v. Benedetto*, 571 F.2d 1246 (2d Cir. 1978); *United States v. Dothard*, 666 F.2d 498 (11th Cir.1982); *United States v. Danzey*, 594 F.2d 905 (2d Cir.), *cert. denied*, 441

U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979).

Even if we apply a less rigorous standard, the challenged evidence does not reveal enough similarity between the two incidents to demonstrate that on both occasions Gamble had the same modus operandi or plan. Sergeant Gant was a female soldier whom appellant met while she was performing military duty. The entire assault took place in a matter of minutes; there was no sexual intercourse; and there was no drinking together. On the other hand, Ms. Coghlan, a civilian, had made a date with appellant early in the day and willingly entertained him at her apartment at 1:00 a.m. They drank and talked together, and Gamble was in her apartment for several hours. He did not suddenly leave, as he had done with Sergeant Gant; but, instead, he fell asleep in her apartment and spent the night there. Although, in each incident, Gamble apparently had a pleasant conversation with the alleged victim before he attacked her, such conduct is not distinctive or unique.

Basically, all the Government established was that on two separate occasions Gamble talked to an adult female and then had an illicit sexual contact with her. Contrary to the position taken by the military judge and by the Court of Military Review, this was not enough to show modus operandi or plan, so the evidence should have been excluded.

## III

The Government urges that, even if we determine that the challenged evidence was admitted erroneously, Gamble waived any right to complain of this error because he failed to object when Gant's testimony ulti-

---

**3.** The District of Columbia Court of Appeals recently discussed in considerable detail "admission of proof of 'other crimes,'" *Thompson v. United States*, 546 A.2d 414, 415 (1988). Judge Schwelb's incisive opinion for the court holds "that where intent is not controverted in any meaningful sense, evidence of other crimes to prove intent is so prejudicial *per se* that it is inadmissible as a matter of law." *Id.* at 423. The opinion also rules that, unless there are "excep-

tional circumstances"—such as "a defense opening statement, or other comparable indication, that intent is a controverted issue"—"the government may not be permitted to introduce other crimes evidence in its case in chief to prove intent (including specific intent where the evidence of such intent is sufficient to go to the jury when the prosecution rests, and the defendant so acknowledges)." *Id.* at 423 and n. 16—424.

mately was offered before the members. *See* Mil.R.Evid. 103(a)(1). This argument, of course, brings into question the effect in court-martial practice of a military judge's ruling on a motion *in limine*.

In a case we reviewed which had been tried before promulgation of either the Manual for Courts-Martial, United States, 1984, or the Military Rules of Evidence, we approved use of motions *in limine*. *United States v. Cofield*, 11 MJ 422 (CMA 1981). In our view, such motions can be helpful because they permit "[a]dvance planning[, which] is in the best interest of the parties and of the judicial system." *Id.* at 430, quoting *United States v. Fountain*, 642 F.2d 1083, 1087 (7th Cir.1981). Moreover, use of such motions can reduce the number of interruptions during a trial and the number of witnesses to be called. However, we recognize that, despite the efficiency of motions *in limine*, a military judge should have considerable discretion to defer a ruling on such a motion until the evidence in question is actually offered at trial. *United States v. Cofield, supra.* At that time, the situation may be quite different from what had been anticipated when the motion *in limine* was submitted.

The drafters of the 1984 Manual for Courts-Martial apparently were convinced of the usefulness of motions *in limine*, for the Manual appears to authorize such motions. R.C.M. 906(b)(13) recognizes a "[p]reliminary ruling on admissibility of evidence" as a request which may be made by a motion for appropriate relief. The Discussion of subsection 13 explains:

A request for a preliminary ruling on admissibility is a request that *certain matters which are ordinarily decided during trial of the general issue be resolved before they arise,* outside the presence of the members. The purpose of such a motion is to avoid the prejudice which may result from bringing inadmissible matters to the attention of the court members.

(Emphasis added.) The Discussion continues, explaining, "*Whether to rule on an evidentiary question* before it arises during trial on the general issue is a matter within the discretion of the military judge." (Emphasis added.) However, there is no hint anywhere in the short rule itself or in the Discussion that, if the military judge does choose to rule before trial on the motion *in limine*, the ruling is any less final than it would be if he did so when the evidence was offered. Indeed, the emphasized portions of the Discussion imply just the opposite. The Drafters' Analysis does not suggest otherwise, commenting only that R.C.M. 906(b)(13) "is new to the Manual, although motions *in limine* have been recognized previously. *See* Mil.R.Evid. 104(c); *United States v. Cofield*, 11 MJ 422 (CMA 1981); Siano, *Motions in Limine*, The Army Lawyer 17 (Jan. 1976)." Manual, *supra* at A 21–50 (Ch. 3).

In the same vein, the Discussion to R.C.M. 905(b)(3)—which prescribes that motions to suppress confessions and admissions, evidence discovered during an unlawful search or seizure, and eyewitness identification "must be raised before a plea is entered"—specifically states, "Questions concerning the admissibility of evidence on other grounds may be raised by objection at trial or by motions *in limine*." Again, there simply is no suggestion that a ruling on a motion *in limine* questioning admissibility of evidence is somehow on an inferior footing or is somehow less final than is a ruling on an objection made during trial.

Similarly, R.C.M. 905(d) instructs:

A motion made before pleas are entered *shall be determined before pleas are entered unless,* if otherwise not prohibited by this Manual, *the military judge for good cause orders that determination be deferred* until trial of the general issue or after findings . . . .

Inferentially, if the military judge does *not* defer his ruling—or, at least, in some manner indicate that his ruling is something less than a final one—then the matter is final—that is, "determined."

The Government relies in part for support of its waiver theory on our decision in *United States v. Thomas*, 11 MJ 388 (CMA

1981); however, its reliance is ill-founded. Although the trial there was held several years before implementation of the Rules for Courts-Martial in the 1984 Manual, the judge in *Thomas* did precisely what R.C.M. 905(d) subsequently permitted: He deferred ruling on the motion *in limine* until the complained-of evidence was offered at trial. Later, when the evidence was offered, defense counsel failed to object, so under those circumstances, we found the potential objection had been waived. However, there is nothing in the language of the judge's ruling here to indicate that he intended his ruling to be anything less than final, and the parties were entitled to treat it as such.

The Government argues that admissibility of evidence offered under Mil.R.Evid. 404(b) inherently is not susceptible to a final ruling on a motion *in limine*—that there is no way for a judge to know before trial whether the evidence as it develops will place an accused's intent in issue or whether evidence of modus operandi will be relevant to identify an accused who denies being the perpetrator of an act.

Of course, the Government's suggestion that such matters are *never* susceptible to being known before trial is as overbroad as would be a suggestion that they *always* may be known. Such possible uncertainty is the very reason why the military judge has discretion on whether to rule before trial as requested. Indeed, Mil.R.Evid. 104(b) affords a military judge who has some question about whether the evidence, as it might subsequently develop at trial, would raise an issue cognizable under Mil. R.Evid. 404(b), the opportunity to admit the evidence subject to later introduction of other evidence making it relevant.

If he does rule, however, and if his ruling leaves no doubt that he intends for it to be final, then it is final for purpose of appellate review.[4] Insisting on a subsequent defense objection at the time the evidence is offered in order to preserve the issue for appeal would be a classic insistence on form over substance.

We realize that in *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), the Supreme Court concluded that a defendant who did not testify at trial was not entitled to review of the district court's ruling which denied his motion *in limine* to forbid use of a prior conviction for impeachment purposes. However, even if contrary to our decision in *Cofield,* this decision by the Supreme Court apparently was intended to be quite limited in scope. *See Luce v. United States,* 469 U.S. at 43, 105 S.Ct. at 464 (Brennan, J., concurring). Thus, we doubt that the Supreme Court has limited reviewability of a trial court's ruling on a motion *in limine* made with respect to evidence that the Government intended to offer under Fed.R.Evid. 404(b).

In any event, court-martial practice need not follow every aspect of Federal criminal practice. As we noted earlier, motions *in limine* were used in courts-martial before the 1984 Manual for Courts-Martial was promulgated. At 305–06. When he promulgated that Manual, the President adopted the practice that had developed and decided that it would promote the efficiency of trials if binding effect was given to rulings on such motions. Accordingly, we conclude that—whatever might be the rule in Federal district courts—the evidentiary issue raised by the appellant's motion *in limine* was properly preserved for appellate review.[5]

## IV

As a last resort, the Government argues that, even if admission of this evidence was erroneous and even if the error was not waived, Gamble suffered no prejudice from

---

4. However, the correctness of the ruling will be evaluated in terms of the conditions that existed at the time when the evidence was received. Thus, even if the evidence would have been inadmissible under the circumstances presented to the judge when he ruled on the motion *in limine,* the ruling will be upheld if, in light of intervening events, the evidence would have been admissible when it was received.

5. Furthermore, the testimony of Sergeant Gant was significant enough that the plain-error rule would permit us to grant relief. *See* Mil.R.Evid. 103(d).

the error. Normally, this question would be a close one: Both versions are plausible, and both are somewhat corroborated—Coghlan's by the physical lacerations and contusions and Gamble's by the comparatively minor extent of those injuries, which he explained as natural results of exuberant lovemaking, and by the victim's own conduct prior to and after the incident.

■ However close the question of prejudice might otherwise have been, trial counsel's extensive and forceful use of Gant's testimony during his closing argument convinces us that prejudice exists. Clearly the prosecutor employed this evidence—admitted in error—to sustain an argument which helped tilt the balance in an otherwise close case. Because of that tilt in the balance, Gamble was prejudiced.[6]

## V

■ When evidence in a rape case reasonably raises the affirmative defense of mistake of fact, the military judge must instruct thereon *sua sponte*. *See United States v. Carr*, 18 MJ 297 (CMA 1984). Appellate defense counsel claim that this defense was raised in the present case with respect to the charges of rape and forcible sodomy. In this connection, they emphasize that Gamble was an invited guest in Coghlan's apartment at 1:00 a.m. and that they were drinking together. Thus, even if she did not in fact consent to intercourse, he might honestly and reasonably have believed that she consented.

Whatever doubts we might otherwise have as to whether this defense was rea-

sonably raised so as to require an instruction are resolved by the circumstances of the trial and the appeal. Among the reasons advanced by trial counsel for admitting the testimony of Sergeant Gant was that this evidence would tend to show "absence of mistake." Even on this appeal, the Government has argued that Gant's testimony was admissible to demonstrate that appellant never entertained a mistaken belief that Coghlan was consenting to his advances.[7]

We perceive an inconsistency in the Government's contention that the possibility of mistake was raised to the extent that it would authorize reception of extrinsic evidence about another sexual offense but was not raised to the extent that it required an instruction to the court members on mistake of fact. Therefore, even if Gamble were not entitled to reversal of the findings of rape and forcible sodomy because of the evidentiary error, he would be entitled to this relief because of the instructional omission.

## VI

The decision of the United States Army Court of Military Review is reversed; and the findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

SULLIVAN, J., concurs.

COX, Judge (concurring in part and dissenting in part):

I agree that the evidence regarding the Gant incident, if relevant at all, was so

---

6. Unlike the situation discussed in the dissent, our conclusion as to prejudice does not involve the spill-over effect which was permitted in *United States v. Hogan*, 20 MJ 71 (CMA 1985). There, evidence admitted on one charge "spilled-over" to another; and as *Hogan* points out, instructions should be given to prevent this. Indeed, had charges relating to the Gant incident been joined in this trial, as Judge Cox points out was possible, such instructions would have been necessary under *Hogan* to prevent such spill-over. Here, the challenged evidence was admitted *directly* on the merits of the alleged rape of Ms. Coghlan, and trial counsel forcefully argued that the evidence helped prove the rape charge. Accordingly, while the mem-

bers might well have succeeded in limiting consideration of evidence to relevant charges, as Judge Cox contends, here, they were *invited* to consider the challenged evidence to prove the rape of Ms. Coghlan.

7. Even if the testimony had been admissible for this limited purpose, *see* Mil.R.Evid. 404(b), the military judge, instead, admitted it for another limited purpose and so instructed the members. Accordingly, since the members were told that they could use the evidence impermissibly, the judge's evidentiary error is not salvaged by this alternative ground urged by the Government.

minimally probative of any proffered purpose that its admission was plainly erroneous. Mil.R.Evid. 103(d) and 403, Manual for Courts-Martial, United States, 1969 (Revised edition). However, I disagree that appellant was necessarily prejudiced. *See* Art. 59(a), Uniform Code of Military Justice, 10 USC § 859(a).

The procedural rules in effect at the time of appellant's trial stated:

> Subject to jurisdictional limitations and at the discretion of the convening authority, charges against an accused, if tried at all, ordinarily should be tried at a single trial by the lowest court that has the power to adjudge an appropriate and adequate punishment.

Paras. 30*g* and 33*h*, Manual, *supra.* The principal exception to this preference for joinder was that, "[o]rdinarily, charges for minor derelictions should not be joined with charges for serious offenses" unless "the minor offense serves to explain the circumstances of the greater offense." Para. 26*c*, Manual, *supra.* *

Under this "liberal" joinder policy, the incriminating evidence pertaining to each of the charges and specifications is typically presented to factfinders at the same hearing. Sometimes the charges and specifications are related; often they are not.

By contrast, admissibility of uncharged misconduct is strictly regulated for the laudable reason that people should be convicted of crime on the basis of evidence that they committed the crime, not because they are bad people. *See* Mil.R.Evid. 404(b), Manual, *supra;* Manual for Courts-Martial, United States, 1984. The irony here is that, had the Government been successful in continuing the court-martial long enough to join the Gant charges to the

court-martial, as it tried to do, Gant's testimony would have been squarely before the members for its own sake, and we would not even be considering spill-over effect, much less reversing a conviction on account of it. Indeed, of all the misconduct before the court-martial, charged and uncharged, the Gant incident ranks among the least in apparent significance.

By far the most severe of the charges were those alleging the brutal rape and sodomy of another young woman, a German. She was attacked while riding her bicycle alone shortly after midnight. Certain aspects of this attack virtually coincided with those of the alleged Coghlan rape, including the near suffocation of the victim and the particular words used in demanding that the victim fellate the perpetrator. In addition, appellant was admittedly out and about that night in two vehicles closely matching the description of vehicles seen in the vicinity of the attack on the German woman. One of these cars was observed driving on the bicycle path immediately after the rape. The driver of this car got out and searched the immediate area of the rape. Evidently, his purpose was to remove the bicycle (which was never recovered) and any other identifying items.

Several hours later, while the German police were surveying the rape scene, the second vehicle was spotted nearby. According to the witness, a nearby resident, "I could observe that this vehicle was driving down various roads at several times, and it also caught my attention that the left taillight of this vehicle wasn't working." According to the witness, this vehicle drove back and forth "[t]hree to four times." Shortly thereafter, about 4:30

---

* The current military rules (Manual for Courts-Martial, United States, 1984) provide as follows:

R.C.M. 307(c)(4): Charges and specifications alleging all known offenses by an accused may be preferred at the same time.

R.C.M. 601(e)(2): In the discretion of the convening authority, two or more offenses charged against an accused may be referred to the same court-martial for trial, whether serious or minor offenses or both, regardless whether related.

Fed.R.Crim.P. 8(a) is more restrictive, providing:

Two or more offenses may be charged in the same indictment or information in a separate count for each offense *if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.* (Emphasis added.)

a.m., appellant was stopped and briefly detained by German police officials. He was driving a vehicle (belonging to a girlfriend) that closely matched the description of the second vehicle, and the left taillight was out. He denied knowing the location of the village in which the rape had occurred, and his account of his whereabouts purported to exclude the possibility that he had inadvertently stumbled on the crime scene. Further, based upon serological comparisons, appellant could not be ruled out as the perpetrator. Finally, items of clothing similar to those worn by the perpetrator were seized from among appellant's possessions.

Despite these and other points of similarity between the two rape charges, the court members acquitted appellant of the attack on the German woman—and rightfully so. Not only was the victim unable to identify her assailant, but the evidence against appellant, in its totality, lacked that definite, conclusive degree of certainty necessary to link him to the crime beyond a reasonable doubt. In other words, despite any risk of Gant spill-over, the court members did their job. Moreover, in comparison with the evidence tending to link appellant to this rape, the Gant incident was trivial.

Another charge of which appellant was acquitted alleged that he had approached another enlisted woman, a Specialist Four Rosado, and "display[ed], through his trousers, his erect penis, grabb[ed] through his trousers, his erect penis with his hand, and stat[ed], 'See what you do to me? You make me horny. Let's go out together,' or words to that effect." A separate charge alleged that he later endeavored to impede a court-martial and alter the testimony of Rosado "by pointing his finger at her, shaking his finger in her face, and stating in an angry and threatening tone of voice, 'You don't tell them I made any passes at you. You don't tell them nothing,' or words to that effect."

By the time of trial, Rosado had separated from the service and returned to the United States. Despite its efforts, the Government was unable to locate her. The prosecution attempted to support its case on these charges with her deposition, previously recorded.

This latter allegation, the attempt to impede justice, was strikingly similar to an event which was uncharged, but was made known to the court-martial in connection with the Coghlan incident. Yet another enlisted woman, Specialist Four Somerville, testified that she was a neighbor of Ms. Coghlan, knew appellant, and was a peripheral witness to appellant's encounter with Ms. Coghlan. According to Somerville's testimony, appellant approached her a week or so after the encounter, when the heat was on him, and tried to tell her what to say to the criminal investigators. She rebuffed this attempt with language which, if directed to an officer under ordinary circumstances, would have assured her own conviction by court-martial and punitive discharge. Appellant, however, said nothing in response to these inflammatory remarks.

Notwithstanding Gant's testimony and despite the similarity of the Somerville-Coghlan incident, the court members acquitted appellant of the Rosado conduct-unbecoming and endeavoring-to-impede-justice charges. Spill-over effect did not seem to be operating there either.

Regarding the Coghlan offenses, the court members had the opportunity to observe her testimony as she related her version of the events. They had before them photographs of the injuries inflicted upon her. They heard the doctors' description of the nature and extent of the trauma and the unlikelihood that such injuries could have been inflicted by mere consensual sexual activity. The members observed the victim break down on the stand as she relived the terror of her experience. There being no evidence that she had a theatrical background, the members were in an excellent position to judge how convincing her presentation was.

The members also observed Specialist Somerville as she described appellant's odd behavior immediately after the fact and again a week later—behavior that strongly

belied an innocent state of mind. Here, too, the members were in an excellent position to judge whether Somerville was fabricating.

Finally, the members were able to observe appellant as he walked them through his version of Coghlan's spontaneous and intensely passionate lust for his body. As before, the members were in superb position to judge the credibility of his account. Their findings indicate that, notwithstanding his denials, his performance left them convinced beyond a reasonable doubt of his guilt.

Like my Brothers, I am occasionally troubled by the potential for spill-over when more than one offense is charged. *United States v. Hogan,* 20 MJ 71, 73 (CMA 1985). The legitimate evidentiary concerns against convicting people because they are bad, rather than because the evidence proves they committed a particular crime, do not vanish when the other misconduct happens to support criminal charges. However, I recognize that there are often cogent reasons in a military environment for combining charges into a single court-martial—charges which, in a civilian context, should be tried separately. In the military, the convening authority is granted initial discretion whether to combine charges; it is then for the accused to move for severance. This latter did not occur here.

In the instant case, a plethora of misconduct and questionable conduct, both charged and uncharged, was before the court members. My survey above represents but highlights. In my estimation, the findings on the Coghlan rape-sodomy were abundantly supported by the record. Moreover, the court members demonstrated their prowess in separating wheat from chaff and in applying the most stringent standards to the evidence. I am convinced that their decision was based overwhelmingly on their estimation of the credibility of the protagonists themselves. The Gant testimony, offered for so-called modus operandi, amounted to nothing when compared to the other evidence properly before the court.

The irony of my Brothers' resolution is that, if the appropriate statutes of limitations have not run and the Government is able to pull the parties together again for another trial, the case could consist of the charges of raping and sodomizing Ms. Coghlan, and that of indecently assaulting Sergeant Gant. I question whether that would be a meaningful improvement over what happened here.

For these reasons, I would affirm the decision below.