**UNITED STATES**

v.

**Captain Ismael RODRIGUEZ, 583–94–2741 FV, United States Air Force.**

**ACM 27072.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 19 April 1988.

Decided 12 July 1989.

Appellate Counsel for the Appellant: Kenneth G. Gale, Esq., Wichita, Kansas; Colonel Richard F. O'Hair and Captain Mark R. Land.

Appellate Counsel for the United States: Colonel Joe R. Lamport; Lieutenant Colonel Robert E. Giovagnoni and Major Jeffrey H. Curtis.

Before HODGSON, HOLTE and PRATT, Appellate Military Judges.

## DECISION

HODGSON, Chief Judge:

The appellant is a military physician assigned to the Nellis Air Force Base Hospital as an Internal Medicine specialist. Contrary to his pleas, he was convicted of committing five indecent assaults over a 14–month period upon four female dependents under the guise of providing medical treatment. The approved sentence is a dismissal, total forfeitures, and nine years confinement. Because a number of the assigned errors challenge the sufficiency of the evidence to support the findings of guilty, a recitation of the facts will be helpful.

Mrs. C.M.M. was examined by the appellant in May 1986, for a kidney disorder. During the examination the appellant was standing very close to her and began "rubbing back and forth against [the witness'] thigh." C.M.M. could feel the appellant getting an erection and got off the examining table. Both she and the appellant pretended that nothing had happened. When she left the examining room she was "shocked" and reported the incident to a female medical staff officer. This individual told C.M.M. that the appellant "was such a superb doctor" and that she "probably imagin[ed] the whole incident." C.M.M. did not pursue the matter further.

Approximately a year later in June 1987, Mrs. D.M.C. saw the appellant because of a recurring gall bladder problem. His examination of her included the pubic area of her genitalia. He also began to rub his groin against her. She stated that she could feel his penis rubbing against her arm. After she left the examining room she told Sergeant Marilyn Bronson, a cardiopulmonary lab specialist, what had happened. Sergeant Bronson did not believe her stating "it couldn't have happened," but she agreed to talk to the appellant about it. When Bronson was called as a defense witness, she acknowledged that D.M.C. had complained about the appellant's "friendly hands." D.M.C. told her husband about the incident and had him accompany her for the next appointment with the appellant.

On 11 June 1987, Mrs. T.J.N. was referred to the Internal Medicine Clinic after a fainting episode possibly associated with a back injury or diabetes. She was seen by the appellant. T.J.N. stated that while she was on the examining table the appellant began "playing" with her buttocks by "grabbing handfuls of it." He then worked his hand under her shorts, put his finger through the leg opening and into her vagina. While this was going on, the appellant told her to relax as he was her doctor and he would "take good care of [her]." The whole experience was unsettling and she told Sergeant Debra Gonzales, an enlisted woman assigned to the hospital, about it. Sergeant Gonzales was uncertain what to do. She suggested that T.J.N. should give the appellant another chance, but if Mrs. N. still thought the examination was "too physical," then she should either make a complaint or see another doctor.

Mrs. N's second appointment with the appellant was a week later. This time the appellant began a stomach examination and "went through the same thing again with sticking his hand under [the witness'] shorts and underwear." He again put his finger in her vagina and this time rubbed it against her clitoris. Once again Mrs. N. told Sergeant Gonzales who referred her to Sergeant Bronson, who was also uncertain what to do. Bronson suggested, however, if Mrs. N. "felt it was wrong, then it was wrong." Mrs. N. decided not to see the appellant again.

Later that same day the appellant stopped T.J.N. in the hospital hall and stated that her blood sugar was elevated and that an additional examination was needed. When Mrs. N. asked to have a chaperone present, the appellant replied, "No, it'll only take a minute" and led her to his

office where he closed the door even though she said she wanted it left open. He told her to bend over from the waist while he examined her for a curvature of the spine. While the witness was in this position, the appellant grabbed her by the hips and pulled her back onto his erect penis. During the incident the appellant told her "[she] was a very beautiful young woman and he would like to see more of [her]," and indicated he would like to take her out for dinner.

Mrs. E.P.F.S. had an asthmatic condition and when she needed a medication refill she sometimes went to the Internal Medicine Clinic where a doctor reviewed her records and wrote a prescription. On 31 July 1987, she saw the appellant who listened to her lungs and gave her an epinephrine shot. During the appointment the witness told the appellant that she had arthritis in the left knee and he suggested an examination. While she was lying on the examining table the appellant begin flexing her leg back and forth, and before she knew it, he had his left hand under her shorts and underwear and his finger in her vagina. Though the witness indicated there was nothing wrong with the other leg, the appellant insisted on examining it. Again he moved his hand down her thigh and inserted his finger in her vagina a second time. The appellant also indicated a need to examine Mrs. S.'s back even though she assured him it was not necessary. During the examination the appellant kept pushing against her with his pelvic region, and when she would move forward he would pull her back or step forward himself. After giving her a prescription, the appellant stated he wanted to see her in two days and asked her "to do her hair so [she] would look nicer." She reported the incident to the hospital First Sergeant.

While the standard procedure at the Nellis hospital is to provide a chaperone when a male doctor is examining a female patient, the practice is not always followed because of the difficulty in obtaining a chaperone on short notice. There were no chaperones present during any of the patient examinations described above.

Colonel (Dr.) Jeffrey H. Bower is the Chief, Division of Medicine, Wilford Hall USAF Medical Center, Lackland AFB, Texas. He is board-certified in the field of Internal Medicine and was accepted by the trial court as an expert in that specialty. Regarding Mrs. C.M.M. and Mrs. D.M.C., Dr. Bower opined that it was possible that the examinations were "within the bounds of proper medicine," and that the appellant's actions were misinterpreted by the patients. However, the appellant's conduct with Mrs. E.P.F.S. and Mrs. T.J.N. were not meaningful medical examinations within the "wildest imagination." He testified that there was no valid medical reason for the manner in which he examined the two women. When a pelvic examination is to be undertaken on a female patient there should be a chaperone present, and if that is not possible, then the patient should be told that this is going to take place. Further, a routine pelvic exam should never be conducted in the manner described by Mrs. E.P.F.S. and Mrs. T.J.N.

The appellant testified that his examinations of the women involved followed proper medical practice, and he emphatically denied any unprofessional conduct with them. He also presented evidence of his reputation as a skilled, highly motivated physician who was well thought of in his field.

In rebuttal, and over defense objection, the prosecution offered the testimony of Mrs. K.S. who stated she was referred to the Internal Medicine Clinic on 6 September 1985, because she was experiencing a severe headache. The appellant was the examining physician. After giving Mrs. S. a shot to reduce the pain in her head, he asked her to disrobe except for her panties. There was no chaperone present. He then began to caress her breasts and thighs. He also ran his hand inside her panties. When she began to "fidget," the appellant stopped the examination and the witness dressed and left. At about 1700 hours that evening the appellant appeared at the witness's on-base quarters and indicated her problem, i.e. headaches, was "stress and that came from not having a man around

and that he would be the man that [she] needed." The witness's husband was stationed in Korea. This incident greatly upset Mrs. S. and she told the chaplain about it. The chaplain informed the hospital commander who considered the occurrence "a misunderstanding" due to the appellant being new in the military.

## I

■ Appellate defense counsel argue that the appellant's behavior with Mrs. C.M.M. and Mrs. D.M.C. (Specifications 1 and 2 of the Charge) does not amount to an indecent assault as a matter of law. They contend that his touching these women with his erect penis was an unintentional, physiologic reaction and was not done with the intent of gratifying his lust or sexual desires. This latter condition is an element of the offense. See MCM Part IV, para. 63 (1984). Of course, whether the appellant's actions were intentional or accidental is a factual determination. Where the acts charged are not necessarily indecent they may be rendered so by the surrounding circumstances. United States v. Gethard, 33 C.M.R. 712 (A.F.B.R.1962). . The appellant's conduct is suggestive of "frottage," a form of sexual activity in which an individual seeks gratification by rubbing against another. See Hinsie and Campbell, Psychiatric Dictionary, Fourth Edition, p. 312.

The test for determining the sufficiency of evidence as a matter of law is whether, considering such evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. United States v. Turner, 25 M.J. 324 (C.M. A.1987). The Government's case meets this standard. Later in this opinion we will exercise our mandate under Article 66(c), UCMJ, 10 U.S.C. § 866(c) and weigh the evidence for factual sufficiency.

## II

■ At trial the appellant presented a two-fold defense. First, that his examination of Mrs. C.M.M. and Mrs. D.M.C. was medically appropriate and the two women

either imagined the incident or misunderstood what was taking place during the examination. In his opening statement civilian defense counsel pointed out that having "an erection is not a crime," and it is not wrong for a doctor to have "some incidental contact with a patient." The clear inference from this statement is that the appellant's actions in rubbing his penis against the women was an accident, devoid of any criminal intent. In his testimony the appellant denied having an erection or intentionally rubbing his penis against C.M.M. and D.M.C. when he examined them. He further insisted that his relationship with the women was on a professional basis and he had never acted with patients in a manner to gratify his sexual desires. Second, he maintained that Mrs. T.J.N. and Mrs. E.P.F.S. were not telling the truth when they testified that he inserted a finger in their vaginas and the acts they described never took place.

To counter this defense evidence the prosecution offered the testimony of Mrs. K.S.M. in rebuttal. Her initial encounter with the appellant as stated above, was virtually identical to that experienced by the women who testified in the case in chief. However, unlike the victims in the case in chief K.S. testified that the appellant came to her house and implied that her headaches were caused by stress which could be relieved if she had sexual intercourse with him.

K.S.'s testimony disclosed uncharged misconduct. Mil.R.Evid. 404(b) states that such evidence of uncharged misconduct "may ... be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." However, such evidence must also be weighed by the trial judge to insure that its probative value is not substantially outweighed by the danger of unfair prejudice. Mil.R. Evid 403. See United States v. Brannan, 18 M.J. 181 (C.M.A.1984).

Over defense objection, the trial judge admitted the testimony for the limited purpose of showing motive, intent, lack of accident or mistake on the part of the ap-

pellant. He properly instructed the members on its limited purpose before the evidence was received and again in his final instructions. *See generally United States v. Ferguson,* 28 M.J. 104, 111 (C.M.A.1989) (concurring opinion by Judge Cox.)

Citing *United States v. Gamble,* 27 M.J. 298 (C.M.A.1988), appellate defense counsel argue that the trial judge erred by admitting K.S.'s testimony in rebuttal. They contend that her testimony, just as that deemed objectionable in *Gamble,* does not establish "intent, design or plan." They further argue that the incident involving Mrs. K.S. was "not closely related in time or place to the charged offenses and is completely dissimilar except for the fact that the accused, a doctor, touched the body of a female patient."

We find the *Gamble* decision to be distinguishable on several grounds. First, the Court of Military Appeals observed in *Gamble* that all the government established was that on two occasions the accused talked to an adult female and then had an illicit sexual contact with her. They stated that these two incidents did not reveal enough similarity to demonstrate that both times Gamble had the same *modus operandi* or plan. Although the appellant's actions with each of the women involved in this case might be considered sufficiently distinctive as to be viewed as a "fingerprint" or "signature" of the person charged, the testimony was not offered as evidence of a common plan or scheme. *United States v. Cuellar,* 27 M.J. 50 (C.M.A.1988); *United States v. Holt,* 21 M.J. 946 (A.F.C.M.R.1986), *pet. denied* 21 M.J. 553 (C.M.A.1987). Rather it was offered to establish that the appellant's actions were not an accident, but were accomplished with the *intent* to gratify a sexual desire.

The appellant testified that his relationship with patients was always conducted on a professional level. The evidence tendered by the government established that approximately eight months before one of the offenses charged, he appeared, uninvited, at the home of a patient in an attempt to convince her that sexual intercourse with him would cure her headaches. Earlier, he had asked her to disrobe when she saw him professionally to complain of a severe headache.

The admissibility of uncharged misconduct depends, in large degree, on the issues raised at trial. *United States v. Wingart,* 27 M.J. 128 (C.M.A.1988). Evidence not admissible in the case in chief may become so in rebuttal by the choice of defense tactics. Here, the appellant specifically denied, as to two offenses, that his acts were accomplished with the intent to gratify his sexual desires. Evidence tending to establish he possessed this state of mind was relevant. As the District of Columbia Court of Appeals stated in *Thompson v. United States,* 546 A.2d 414, 423 (D.C.App.1988):

> "[W]hether other crimes evidence is admissible under the intent exception should ordinarily be deferred until the trial judge had sufficient knowledge of the government's need for the evidence, *and of the defendant's defense,* to make an informed judgement." (Emphasis added.)

The fact that the appellant had earlier sought out a patient in order to gratify his sexual desires is evidence tending to support the prosecution's position that his actions on a later date were for the same purpose. *See generally United States v. Fortna,* 796 F.2d 724 (5th Cir.1986) (evidence of defendant's involvement with cocaine and marijuana prior to period covered by indictment admissible to prove intent.)

We affirm on an additional basis as the challenged evidence in the case before us was admitted in rebuttal, not in the case in chief as was the situation in *Gamble.* The trial judge had all the facts before him as suggested in *Thompson, supra* when he admitted the testimony. A military judge has broad discretion in determining what evidence is to be admitted or excluded in rebuttal. *United States v. Goodwin,* 770 F.2d 631 (7th Cir.1985). Further, we are convinced that the trial judge performed the proper balancing test prior to admitting the evidence. Mil.R.Evid. 403. Based on the facts before us we hold the trial judge

was within the broad discretion given him to accept or reject rebuttal evidence.

### III

■ In an attempt to challenge the credibility of Mrs. E.P.F.S., the appellant proffered testimony from a Nellis hospital attendant that during a five or six day stay on her ward, E.P.F.S. displayed behavior that was suggestive of a histrionic behavior disorder. This conclusion was based on the attendant's observation that E.P.F.S. flirted with male technicians, sought back massages from them, and asked to have her pillow "fluffed" an excessive number of times. Based on this testimony, trial defense counsel sought to call as a witness Doctor Schmidt, identified only as a "base psychologist," who would testify that the actions of E.P.F.S. *"potentially describe"* a histrionic behavior disorder and individuals suffering from this dysfunction "are prone to make false complaints." There is no indication that Doctor Schmidt examined or even saw E.P.F.S.

At trial defense counsel asserted that the evidence was admissible under Mil.R.Evid 404(a)(2) as "evidence of a pertinent trait of character of the victim of a crime ...," or alternatively, under Mil.R.Evid. 608(c) as a "motive to misrepresent." He maintained that the proffered evidence shows that E.P.F.S. was motivated by a psychological disorder to bring false accusations. Defense counsel acknowledged that Rule 404(a)(2) refers to a "character trait of peacefulness," but contended that although the case at hand was not "your typical hitting assault," a histrionic character disorder is a pertinent character trait which the defense is entitled to present.

The appellant's argument as to the admissibility of such evidence would be better received if there was any indication in the record that E.P.F.S. had a histrionic character disorder. The testimony elicited from the hospital attendant essentially established that E.P.F.S. was a demanding patient—something she denied on cross-examination. The defense stated that Doctor Schmidt would, based on the hospital attendant's recitation of E.P.F.S.'s actions

during her stay in the hospital, opine that such behavior *"potentially describes"* a histrionic behavior disorder. This is a far cry from concluding that a particular witness suffers from such a disorder. *See generally United States v. Means,* 24 M.J. 160 (C.M.A.1987).

■ The trial judge found that there was an insufficient basis to conclude that E.P.F.S. had a histrionic behavior disorder and would not allow the defense to present such impeachment evidence to the members. The extent of impeachment of a witness is within the discretion of the trial judge. We find no abuse of that discretion here. *United States v. Tyler,* 26 M.J. 680 (A.F.C.M.R.1988), *aff'd* 28 M.J. 253 (C.M.A. 1989).

■ In a related claim of error, the appellant contends that the judge erred in refusing to allow the trial defense counsel to cross-examine Mrs. T.J.N. about her separation from her husband. The nature and extent of cross-examination is also an area in which the trial judge exercises broad discretion. The military judge properly sustained the trial counsel's objection. *United States v. Tyler, supra.*

### IV

■ Appellate defense counsel maintain that the appellant was denied a fair trial by the improper and inflammatory argument of the trial counsel. They find particularly egregious the comparison the trial counsel made between the appellant and three well-known television evangelists.

The rule covering closing arguments by the government is simple—they must be based on the evidence and must not unduly inflame the passions or prejudices of the court-members. *United States v. Clifton,* 15 M.J. 26 (C.M.A.1983). Within that broad range, the trial counsel may strike hard blows so long as they are fair. *See United States v. Doctor,* 7 U.S.C.M.A. 126, 21 C.M.R. 252 (1956).

■ In assessing the inflammatory nature of a closing argument, the presentation must be looked at in its entirety and not through isolated sentences or phrases.

The argument the appellant challenges on appeal and to which there was no objection at trial, covered approximately 16 pages. The appellant was pictured in a most unfavorable light, with the perceived weaknesses in his version of the events examined in great detail. The failure of his trial defense counsel to object leads to a reasonable inference that nothing improper was said.

A criminal trial is not a tea dance, but an adversary proceeding to arrive at the truth. Both sides may forcefully urge their positions so long as they are supported by the evidence. Considering the trial counsel's closing argument *in toto*, it was within the bounds of fair comment considering the state of the evidence. *See United States v. White*, 23 M.J. 84 (C.M.A. 1986).

## V

The appellant contends that "a dispassionate examination of the evidence" in his case will create a reasonable doubt as to his guilt. He argues there is "virtually no proper excuse" for believing the complaining witnesses over his absolute denial coupled with character evidence offered in his behalf.

Cases involving allegations of misconduct by a physician against a patient are invariably one-on-one confrontations since there are ordinarily no witnesses to the incident. The appellant argues there is little or no corroboration for the allegations. This is not accurate. Each of the four women reported the incident to someone immediately after it occurred. This is corroboration that the members could consider in assessing their credibility. Further, it does seem unlikely that four women, unknown to each other, would each falsely report an indecent assault with a similar pattern of physician misconduct.

Much of the crucial testimony offered by the appellant and the four complaining witnesses is in total conflict. He testified that two of the women misunderstood his actions or imagined that something happened that did not. He totally denied the actions attributed to him by the other two women.

The outcome of this trial rested on the weight the members chose to give each witness. *United States v. Lecappelain*, 9 M.J. 562 (A.F.C.M.R.1980).

We have a statutory mandate to review evidence and in doing so we must judge the credibility of witnesses and determine controverted questions of fact, remembering that the factfinders saw and heard the witnesses. Article 66(c), UCMJ. Proof beyond a reasonable doubt does not mean that the evidence must be free of conflict. *United States v. Steward*, 18 M.J. 506 (A.F.C.M.R.1984). This was a hard fought trial. Both sides contested every point. The members were properly instructed, and returned a verdict that established they believed the four women and not the appellant. The evidence supports their conclusion. We have examined the record of trial, and like the court below, we are convinced beyond doubt that the appellant is guilty of the offenses alleged. *United States v. Lips*, 22 M.J. 679 (A.F.C. M.R.1986), *pet. denied* 24 M.J. 45 (C.M.A. 1987).

## VI

We have examined the remaining assigned errors and resolve them against the appellant. R.C.M. 920(f); *United States v. Hargrove*, 25 M.J. 68 (C.M.A.1987); *United States v. Anderson*, 28 M.J. 895 (A.F.C.M. R.1989); *United States v. Berman*, 28 M.J. 615 (A.F.C.M.R.1989).

## VII

Finally, appellate defense counsel suggest that the approved sentence is "grossly inappropriate." They point out that there was no permanent injury to any of the women, and at worst the appellant stepped over the "line of propriety." In our society a physician occupies an exalted position because he is skilled and experienced in matters about which the general public knows little or nothing. Therefore, a patient must put great faith and trust in the advice and acts of the physician. As an officer, and a physician, this appellant occupied a position of exceptional trust. He

betrayed that trust with a serious breach of the proper relationship between himself and his patient. Despite this, we believe some reduction of the approved confinement is warranted. Accordingly, we find appropriate only so much of the sentence as provides for a dismissal, total forfeitures, and confinement for four years. Article 66(c), UCMJ. The findings of guilty and the sentence, as modified, are

AFFIRMED.

Judges HOLTE and PRATT concur.