UNITED STATES, Appellee,

v.

Ismael RODRIGUEZ, Captain, U.S. Air
Force, Appellant.

No. 63,122.
ACM 27072.

U.S. Court of Military Appeals.

Argued April 17, 1990.

Decided Sept. 25, 1990.

As Amended Nov. 28, 1990.

For Appellant: *Kenneth G. Gale, Esq.* (argued); *Colonel Richard O'Hair* and *Captain Mark R. Land* (on brief).

For Appellee: *Captain Thomas E. Wand* (argued); *Colonel Robert E. Giovagnoni* and *Major Paul H. Blackwell, Jr.* (on brief); *Captain David G. Nix* and *Captain Morris D. Davis.*

For Appellant on Petition for Reconsideration: *Kenneth G. Gale, Esq., Lieutenant Colonel Jeffrey R. Owens* and *Captain David D. Jividen.*

*Opinion of the Court*

COX, Judge:

Appellant was tried by a general court-martial before members. Contrary to his pleas, he was found guilty of committing indecent assault upon five different women, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934.[1] He was sentenced to confinement for 10 years, total forfeitures, and dismissal. The convening authority dismissed one of the assault specifications and approved the sentence except for confinement exceeding 9 years. The Court of Military Review approved the findings, but further reduced the confinement to 4 years, while approving the remainder of the sentence. 28 MJ 1016 (1989).

This Court granted review of the following issues:

I

WHETHER THE MILITARY JUDGE ERRED BY ALLOWING EVIDENCE OF UNCHARGED MISCONDUCT.

II

WHETHER THE MILITARY JUDGE ERRED BY GIVING AN INSTRUCTION ON THE DEFENSE OF ACCI-

---

1. With respect to one victim, he was convicted of two assaults separated by a week. (This footnote is added on reconsideration.)

DENT WHICH REQUIRED THE COURT MEMBERS TO CONVICT APPELLANT FOR AN ACCIDENTAL BUT NEGLIGENT TOUCHING IN CONFLICT WITH THE REQUIREMENT TO FIND A SPECIFIC INTENT.

In addition, this Court ordered briefs and argument on the issue specified as follows:

WHETHER APPELLANT WAS PREJUDICED BY IMPROPER REFERRAL OF THE ADDITIONAL CHARGE FOR TRIAL.

## I

### A

Appellant was assigned to Nellis Air Force Base Hospital in July 1985 as an Internal Medicine Specialist. The charges against him arose out of his treatment of five female patients, all military dependents whom he had examined at the hospital. The five women provided the following testimony.

"Sharon" testified that she was seen by appellant in May 1986 due to a "mitr[al] valve prolapse" and "some circulatory problems." During the examination, appellant placed his hands under her skirt, putting his fingers just inside her underwear. Appellant did not ask if she had any pain in that area. The witness became flustered, lowered her skirt, and said, "I don't think there's anything wrong there." Appellant did not say anything. Sharon testified that she previously had another examination for the same problem with a female doctor who simply listened to her heart, palpated her mid-section, and asked her if she experienced any pain.

"Candice" testified that she also was examined by appellant in May 1986 for a possible kidney disorder due to anorexia. The witness stated that, during the examination, she was lying on a table with appellant probing her abdomen. At one point, she felt appellant rubbing his groin along her thigh and felt his penis become erect. The witness sat up away from appellant and could see that his penis was erect. She got off the table and left the examination room, saying nothing to appellant. She told a nurse what had happened, but the nurse responded that it was probably her imagination.

"Diana" testified that she was seen by appellant in June 1987 for recurrent gall bladder pain. During the examination, appellant had her lie on a table while he probed her abdomen. At one point, appellant slid his hand under her pants and into her groin area, on her pubic hair. She testified that appellant did not, however, place his fingers into her vagina. According to the witness, appellant then began rubbing his groin against her, so much so that she noticed his penis was erect. She became very uncomfortable and raised her arm above her head. Appellant took her arm, placed it back down at her side, and again rubbed his groin area against her arm. The witness reported the incident to an enlisted member who worked in the Internal Medicine Department; the service-member said she would speak to appellant.

"Teresa" testified that she was seen by appellant in June 1987 for diabetes and back pain near her shoulders. She testified that appellant had her lie on her stomach so he could examine her back. According to the witness, appellant ran his hands down her back and began "massaging" her buttocks, "playing with it, grabbing handfuls of it." Appellant then moved his hand inside her shorts and inserted his finger "[b]arely inside" her vagina. The witness became very nervous, but said nothing. After the examination, she also spoke to an enlisted member in the department, but to her knowledge, nothing was said to appellant about the incident.

A few days later, she returned to the hospital, where appellant told her he wanted to examine her back again. She said it was fine, fearing another incident. Apparently appellant pressed the issue, and she allowed him to examine her again. As she lay on her stomach, appellant again placed one of his fingers in her vagina. She "started to say 'Excuse me, but that's not my back,' " but only "got as far as excuse me." Appellant apologized and withdrew

his hand; but shortly thereafter, he replaced his finger in her vagina and began massaging her clitoris. She testified that the motion of appellant's finger against her clitoris felt like "[f]oreplay." The witness left the examination room very upset and spoke with someone in the department about the incident. Later that same day, appellant approached her and said he needed to speak with her about her blood sugar level. The witness asked him to let her get a nurse to be with her, but appellant insisted it would "only take a minute." They went into an examination room where appellant said he wanted to check her lower spine. She asked appellant to leave the door open, but appellant closed the door. Appellant then had her bend over at the waist. As appellant stood behind her, he pulled her by the hips into his groin area. Earlier, appellant told her that he found her very attractive and that he would like to go out with her sometime.

Finally, "Erin" testified that she was seen by appellant in July 1987 in order to get a prescription refill for asthma medicine. She related that appellant examined her before authorizing the refill. Appellant had her lie on her back as he listened to her breathing. He noted that she was wheezing and recommended a shot of epinephrine. After he gave her the shot, they spoke for a few minutes, waiting for the medication to take effect. The witness mentioned that her knee had been bothering her, and appellant said he would take a look at it. According to the witness, appellant moved her leg back and forth, but "[t]he next thing I know, he's come under my shorts and under the underwear I was wearing and put his finger in me." Appellant then said he wanted to check her other knee, to which she responded, "No, there's no problems with my other knee," but appellant insisted. Appellant again moved her leg up and down, and eventually moved his hand to her upper thigh and put his finger inside her vagina. Appellant then said he "wanted to check" her back. She responded that her "back was fine," but appellant again insisted. Appellant had her stand with her back to him and then

bend over at the waist. He then moved his hand up and down her back, and pulled her hips toward him. She tried to pull away, but he repeated this. She testified that she left the examining room "stunned" and felt she had been molested.

The Government called Colonel (Dr.) Jeffrey Bower, of Lackland AFB, as an expert in internal medicine. Dr. Bower was informed that, during the examinations of all of the women, no chaperon was present. Dr. Bower testified that it was standard practice to have a chaperon present when examining a female patient's "intimate areas," but due to "manpower constraints," this was "not always possible." During "a pelvic examination" specifically, however, "everyone would agree you better have a chaperon present."

Regarding Candice's examination, Dr. Bower acknowledged it was quite possible that appellant's having an erection was just physiological and did "not necessarily" imply "he was doing anything wrong." Regarding the incident with Diana, Dr. Bower opined that, although an examination for abdominal pain would include probing in the pubic area, it was inappropriate to conduct such an extensive examination without first informing the patient. Regarding Sharon, Dr. Bower stated on cross-examination that it was possible appellant was examining her femoral artery in the pelvic region, which is well within the bounds of a normal examination for a mitral valve prolapse. As to Teresa, in Dr. Bower's opinion, the examination, as she described it, "didn't meet any standard of medical examination." Regarding Erin, there was "no medical reason ... whatsoever" for the examination as appellant allegedly conducted it. The Government rested its case-in-chief after Dr. Bower's testimony.

On cross-examination by defense counsel, two of the victims admitted that it was possible appellant's contact was accidental and they may have been mistaken as to his motives. A number of witnesses, including former patients, also testified that appellant had an excellent reputation as a diagnostician and that there had never been

any complaints as to his bedside manner or professionalism as a medical doctor.

Appellant also testified in his own behalf. On direct examination, he denied that any of the alleged indecent assaults occurred. He insisted that the examinations were all within accepted medical practice.

On cross-examination, the following took place:

Q: So you have *never*, with these five women or with *any* other female patient—

A: *I never have—*

Q: *—ever acted in a manner to gratify your sexual desires?*

A: *That is exactly—I never have.*

Q: *You have never intended to gratify your sexual desires with any behavior with any patient whatsoever?*

A: I *never.*

Q: Do you recall the name of ... [Karen]?

A: Yes, I remember.

DC: Your Honor, I'm going to object and request an Article 39(a)[, UCMJ, 10 USC § 839(a)] session to discuss the possible relevance and all of the questions regarding this person.

(Emphasis added.)

Out of the presence of the members, trial counsel proffered that if "Karen" was called to testify, she would relate the following: In August 1985, 9 months before the first sexual assault charged herein allegedly occurred, she was seen by appellant because she had "suffered a blackout." During the examination, appellant was massaging her breasts. Then he had her lie on her back while he placed his hands inside her underwear and moved his fingers on top of her vagina. She had never had a physical examination like this and was "upset" by the procedure. Later that day, appellant came to her house and said he needed to speak with her about her tests. She was apprehensive about letting him in, but did so anyway. During the conversation, appellant explained that her illness was probably due to her not having a man around (her husband was on assign-

ment in Korea) and that "he would be the man that she needed." She ordered appellant to leave. "He took her arm ... and put a piece of paper" in her hand "which had his phone number" on it. At this point, her young son came into the house. She took her son to her side and told him not to leave, but appellant told him to go outside to play. At this point, she insisted that appellant leave, and he did so. A few nights later, at about 10 p.m., there was a knock on her door. When she answered it, appellant was standing in the doorway. He "tried to come" in, but she "shut the door on his foot." He "pulled his foot" away and left. She reported the incident to Major Calloway, the base chaplain. Trial counsel also proffered that Major Calloway would testify that he spoke with appellant about Karen's complaint, advising him "to watch himself," although he could not recall appellant's reaction.

Trial counsel proffered the testimony of Karen and Major Calloway as relevant under Mil.R.Evid. 404(b), Manual for Courts–Martial, United States, 1984, "to show absence of mistake, [and appellant's] intent and motive ... to gratify sexual desire by fondling, caressing female patients." Defense counsel objected, arguing that the incident was irrelevant and so remote in time that it only showed bad character and that its prejudicial effect substantially outweighed its probative value under Mil.R. Evid. 403. The military judge found that, although "very volatile," the evidence of other misconduct was offered for a proper purpose under Mil.R.Evid. 404(b), and he ruled the evidence's probative value was not substantially outweighed by its prejudicial effect.

Karen and Major Calloway testified as proffered. The military judge preceded their testimony with a cautionary instruction to the members. In response to this evidence, appellant re-took the stand and denied that any sexual assault had occurred with Karen, although he admitted giving her his phone number. The military judge repeated the limiting instruction to the members regarding the testimony of

Karen and Major Calloway when he provided general instructions on findings.

## B

■ Evidence of uncharged misconduct offered simply to prove that an accused is a bad person is inadmissible. Such evidence may be admissible, however, for other purposes, including to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Mil.R.Evid. 404(b); *United States v. Reynolds*, 29 MJ 105 (CMA 1989).

■ The threshold question for deciding admissibility of uncharged misconduct "is whether the evidence of the misconduct is offered for some purpose other than to demonstrate the accused's predisposition to crime and thereby to suggest that the factfinder infer that he is guilty, as charged, because he is predisposed to commit similar offenses." *United States v. Castillo*, 29 MJ 145, 150 (CMA 1989). Upon a determination that the evidence is offered for a proper purpose under Mil.R.Evid. 404(b), it is then subject to additional scrutiny, including: whether the evidence reasonably tends to prove that the accused committed the prior crimes, wrongs, or acts, *see United States v. Mirandes–Gonzalez*, 26 MJ 411 (CMA 1988); whether some "fact ... of consequence" is made "more" or "less probable" by the existence of the evidence, *United States v. Ferguson*, 28 MJ 104, 108 (CMA 1989); *see United States v. Thompson*, 30 MJ 99 (CMA 1990); Mil.R.Evid. 401 and 402; and whether the "probative value is substantially outweighed by the danger of unfair prejudice," Mil.R.Evid. 403; *United States v. Reynolds, supra* at 109. We conclude that the testimony of Karen and Major Calloway was properly admitted at trial.

■ If appellant had simply denied that the charged sexual assaults ever happened, the prosecution would have been hard pressed to proffer the uncharged misconduct evidence for any purpose other than to show appellant's predisposition to commit sexual assaults. *Cf. United States v. Gamble*, 27 MJ 298 (CMA 1988). However, appellant's position from the beginning of trial was that the contacts were accidental. In his opening statement, defense counsel asserted that appellant's erections during several of the examinations were the result of "incidental contact" with the patients. Cross-examination of two of the victims, Diana and Candice, was directed at showing that appellant's erections may have occurred "accidental[ly]" while he rubbed against their thighs as they lay on the examination table. Likewise, cross-examination of Erin was directed at suggesting that appellant may have "accidental[ly]" placed his finger inside her vagina and that he may have accidentally contacted her from behind with his groin as he had her bend over. In cross-examining Sharon, counsel sought to impeach her with her failure to report the incident immediately because she "did not want to jeopardize somebody's career." Finally, in cross-examining Teresa, counsel sought to impeach her by having her admit that she was perhaps "just being overly sensitive."

In addition to suggesting accident, the defense also sought to refute criminal intent. Defense counsel's cross-examination of Dr. Bower sought to establish that it was not always possible to have a chaperon present when examining female patients and that the physical contact by appellant with the female patients was not improper. All of the defense witnesses testified that appellant had a reputation as a "thorough" and "professional" diagnostician. Finally, when appellant himself was asked by trial counsel, *without any objection by defense counsel*, whether he had *ever* sought to gratify his sexual desires with any female patient, appellant insisted that he had never done so.

Against this backdrop, the testimony of Karen and Major Calloway was proffered. Such testimony was probative to refute appellant's assertions that the intimate physical contact between himself and female patients was accidental. The evidence of appellant's contact with Karen, as well as his continued attempt to solicit her affections, was probative to refute his

claim that he never sought to gratify his sexual desires with any female patients. The testimony of Major Calloway was probative to show that appellant intended to gratify his sexual desires, despite being advised by a superior officer that his conduct with female patients had been called into question. The uncharged misconduct was not so remote in time or circumstance to the charged offenses that its probative value was depreciated. *Cf. United States v. Reynolds, supra* at 106–07.

■ Lastly, the testimony was proper rebuttal of appellant's bold, if not inadvertent, assertion that he would *never* commit an indecent assault on *any* patient. *Cf. United States v. Trimper*, 28 MJ 460, 467 (CMA), *cert. denied*, — U.S. ——, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989).

■ The military judge correctly determined that the evidence could support a finding in the members' minds that the uncharged misconduct had occurred, and that it was relevant and probative of intent and absence of mistake or accident. Although certainly "volatile," its probative value was not substantially outweighed by its prejudicial effect. Further, the judge twice provided the members with limiting instructions that the evidence was not to be considered as proof that appellant was a bad person, but only for the proper purposes under Mil.R.Evid. 404(b). *Cf. United States v. Rappaport*, 22 MJ 445 (CMA 1986). We repeat our admonition to the bench and bar that use of prior sexual misconduct to prove a sexual-misconduct case remains considerably limited. *See United States v. Reynolds; United States v. Gamble; United States v. Rappaport;* all *supra*. Under the circumstances of this case, particularly because the prosecution waited to offer the uncharged-misconduct evidence to rebut appellant's claim of accident and lack of criminal intent, we are convinced that the evidence was correctly offered and admitted for a limited purpose.

## II

Before closing arguments, the military judge and counsel discussed giving the members an instruction on accident:

MJ: I'll give them an instruction concerning accident. Defense Counsel, do you feel that's been fairly raised by the evidence, or do you think that your instruction concerning incidental contact on the consent definition would cover that?

DC: I'd prefer the additional instruction on mistake and accident, since that was one of the grounds that Trial Counsel alleged in getting ... [Karen's] testimony before this court.

MJ: Trial Counsel, what's the Government's position?

TC: That's fine, Your Honor.

MJ: Which portion of the accident instruction do you wish me to give, Defense Counsel?

DC: Your Honor, I'm not on the correct page.

MJ: I believe it's 5–4 [from the Military Judge's Benchbook].

DC: Your Honor, is your question how would I propose modifying?

MJ: Well, *there are a number of accident instructions.* What I would propose is ... as follows: "The evidence has raised the issue of accident in relation to the offenses of indecent assault. There has been testimony that the accused, during the treatment of the patients, may have accidentally during his examinations of them, touched them in the alleged manner. Accident is a complete defense to the offense of indecent assault. The accused was doing a lawful act in a lawful manner free of any negligence on his part. If unexpected touching occurred, the accused is not criminally responsible. *The defense of accident has three parts: First, that the accused's act resulting in the touching must have been lawful; second, that the accused must not have been negligent—in other words, the accused must have*

*been acting with the amount of care for the safety of others that a reasonably prudent person would have used under the same or similar circumstances; and third, the touching must have been unperceivable and unintentional. The burden is on the prosecution to establish the guilt of the accused and you must be convinced beyond reasonable doubt that the touching was not an accident before you can convict the accused."*

Defense counsel, any objection to that?

DC: No, Your Honor.

(Emphasis added.)

The military judge gave the instruction almost exactly as he proposed. For each specification, the military judge also provided instructions that the Government had to prove beyond a reasonable doubt that appellant had the specific intent to gratify his sexual desires. He also instructed the members that the burden always remained with the Government to prove all elements of guilt beyond a reasonable doubt. Appellant claims that the accident instruction was error, notwithstanding defense counsel's failure to object. We disagree.

RCM 916, Manual, *supra,* which enumerates defenses available to an accused, states:

(f) *Accident.* A death, injury, or other event which occurs as the *unintentional* and unexpected result of doing a *lawful act in a lawful manner* is an accident and excusable.

### Discussion.

The *defense* of accident is not available when the act which caused the death, injury, or event was a *negligent* act. (Emphasis added.)

The elements of an indecent assault are:

(1) That the accused assaulted a certain person not the spouse of the accused in a certain manner;

(2) That the acts were done with the intent to gratify the lust or sexual desires of the accused; and

(3) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

Para. 63*b,* Part IV, Manual, *supra.*

■■■ The gravamen of the sexual offense is that the accused committed an assault (an intentional act) with the specific intent of gratifying his sexual desires. Ordinarily, the issue surrounding an accident-defense instruction is simply whether the accused has raised enough evidence such that the members may determine that his conduct was not negligent. *See United States v. Ferguson,* 15 MJ 12, 17, 20 (CMA 1983) (accused's characterization alone that shooting wife was an accident did not raise accident defense when evidence showed accused to be negligent).

Although the instruction did somewhat confuse the element of specific intent with negligence, the members were still properly informed that appellant's conduct had to be lawful and unintentional, as well as free of negligence. The military judge gave defense counsel the opportunity to modify the instruction, but he declined. The preferable tack for this particular case would have been for defense counsel to request a specific additional instruction informing the members that, although appellant's conduct may have been negligent, they may determine that he did not intentionally touch any of the victims or have the specific intent to gratify his sexual desires. This essentially was accomplished by an instruction which actually preceded the accident instruction, informing the members that there was evidence that the patients had consented to incidental contact during the examinations. The members were also instructed several times that the burden lay with the Government to prove appellant's specific intent beyond a reasonable doubt. In light of the instructions as a whole, as well as the strength of the Government's case against appellant, we are convinced that the instruction on accident did not materially prejudice appellant. *Cf. United*

*States v. Hargrove,* 25 MJ 68 (CMA 1987), *cert. denied,* 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988).

\*     \*     \*     \*     \*     \*

Upon reconsideration the original Part III (31 MJ at 157–59) is withdrawn and the following substituted:

### III

The offense in which Sharon was the victim was originally preferred as specification 2 of the Charge. That specification alleged appellant's indecent assault upon the victim "between on or about February and on or about April 1987 ... by feeling her genital area with his hand, with the intent to gratify his sexual desires." At the time of the initial Article 32 [2] hearing, on December 29, 1987, the prosecution was already aware that the date of the incident with Sharon was incorrectly alleged. The victim was not present at this hearing; her sworn statement to law enforcement officials was received for purposes of the investigation.

Two months after the initial Investigating Officer's Report, a new specification was preferred under the Additional Charge which was the same as specification 2 of the Charge except that the date of the offense was alleged to be "on or about 2 May 1986."

A separate Article 32 hearing was conducted on the Additional Charge. At this hearing, Sharon testified. The investigating officer, who had also conducted the first investigation, summarized her testimony as follows:

IO Ex 2 [her prior statement] is my statement and is correct except for the time of the incident with the accused. When I was interviewed by the OSI, I indicated the incident occurred in 86 or 87, I was not sure. The OSI agent indicated I needed to state a date, the OSI would check it out and modify the statement if needed. IO Ex 3 [victim's medical records] appears to properly reflect the incident, occurring on 2 May 86. The accused's demeanor was otherwise unremarkable.

I was wearing bikini type panties. The accused put one, perhaps both of his hands, under the top of the front of my panties. In this regard, he checked for several minutes. I don't know how many minutes. I was nervous. I was wearing a knee length skirt; I don't recall which one.

On cross-examination: In my statement, IO Ex 2, when I referred to "spring," I was thinking of January 87. After the incident I related the matter to my husband and he told me to not revisit the accused. I don't recall if I did lay down or sat up during the pelvic touching; I believe I was in both positions. The accused put his hands just beneath the top line, front side, of my panties.

In his report the investigating officer recommended against referring the Additional Charge and its specification to trial. He also recommended that specification 2 of the Charge be withdrawn. However, he further recommended that, should the convening authority decide to refer the Additional Charge and its specification to trial,

[t]he words "genital area" be replaced with: "lower pelvic region under her panties." This would comport with the expected proof in this regard.

The staff judge advocate in his advice to the convening authority recommended that specification 2 of the Charge be withdrawn and that the Additional Charge and its specification be referred to the original court-martial with modifications substantially as suggested by the investigating officer. The convening authority so ordered. Apparently, this staff judge advocate's advice was not served on defense counsel.[3]

For whatever reason, presumably a clerical error (though not necessarily by a clerk), the convening authority's order was not carried out. The specification remained as drafted prior to the second Article 32 hearing: *i.e.,* the date was "on or about 2 May 1986," but the conduct was still stated as "feeling her genital area with his hand," rather than "placing his hand or hands on her lower pelvic region, underneath her panties," as the advice had recommended. Such was the specification of

---

**2.** Uniform Code of Military Justice, 10 USC § 832.

**3.** In his response to the post-trial recommendation, *see United States v. Goode,* 1 MJ 3 (CMA 1975); RCM 1106(f)(4), Manual for Courts–Martial, United States, 1984, defense counsel stated that he had not been served before trial with the staff judge advocate's pretrial advice.

the Additional Charge on which appellant was arraigned at the court-martial; such were the "flimsies" (copies of the charges and specifications distributed to the court members); such were the instructions on findings given by the military judge.

After the court-martial, the staff judge advocate prepared his recommendations to the convening authority. RCM 1106, Manual, *supra.* These recommendations were served on trial defense counsel, who, in responding, then brought to light the fact that the specification of the Additional Charge, as tried, did not comport with the convening authority's referral order. Due to the error, defense counsel asked that the Additional Charge and its specification be dismissed and that the sentence to confinement be substantially reduced.

In an addendum to his own post-trial recommendation, the staff judge advocate pointed out that the language that should have been referred "was so close to that originally charged that the accused could not have been prejudiced thereby."[4] Nevertheless, "out of a[n] abundance of caution," the staff judge advocate recommended that the convening authority dismiss the Additional Charge and its specification and reduce the confinement from 10 to 9 years. The convening authority did so. Yet, even a second corrected copy of the court-martial order does not reflect the amended version. The Court of Military Review, in exercising its sentencing discretion under Article 66(c), UCMJ, 10 USC § 866(c), further reduced the confinement to 4 years but otherwise affirmed the approved sentence. 28 MJ at 1024.

The issue before us is whether receipt of evidence regarding the Sharon incident prejudiced appellant with respect to findings on the other specifications (the "spillover" effect) or the sentence.[5] We are satisfied that appellant was not prejudiced. Given the sentence relief already accorded appellant, he clearly could not have been prejudiced as to sentence.

Regarding findings, appellate defense counsel rely on our decisions in *United States v. Haye*, 29 MJ 213 (CMA 1989),

and *United States v. Hogan*, 20 MJ 71 (CMA 1985), in claiming that the improper referral unduly prejudiced appellant. Haye was convicted of fraternization and adultery; Hogan was convicted of two specifications of rape. In *Hogan*, the Court of Military Review found that one of the rapes was proven with inadmissible hearsay. The court, therefore, dismissed that specification but allowed the other rape specification to stand. Similarly in *Haye*, the Court of Military Review found that the adultery specification was proven in part by an inadmissible confession. The court dismissed the affected specification but affirmed the fraternization specification. In both cases we reversed and remanded for rehearings, holding " 'that the risk' was 'too great that the evidence of the' dismissed" specification "spilled over" to the specification which was affirmed. *United States v. Haye, supra* at 214 (*quoting United States v. Hogan, supra* at 73).

In the instant case, we note that no evidence from the Additional Charge was used to prove the other specifications; each victim testified separately as to each offense. Given the evidence of the remaining specifications of which appellant was properly convicted, plus the properly admitted rebuttal evidence of Karen, we detect minimal risk that the evidence regarding Sharon spilled over. We are satisfied that the factfinders could separate the evidence of each specification. In any event, it would appear that the evidence regarding the offense against Sharon would have been just as admissible in rebuttal as the evidence of the offense against Karen. Thus, even if the evidence had not been introduced in the prosecution's case-in-chief, it could still have been before the factfinder later on.

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge EVERETT and Judge SULLIVAN concur.

4. Either variation would have been consistent with her actual trial testimony.

5. We would be less than candid if we did not acknowledge the never-never landish quality of this issue. Appellant obviously received a windfall when the scrivener failed to make the minor changes to the specification ordered by the convening authority. But for this omission, appellant would stand guilty of the offense against Sharon as well.