# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––––

### No. ACM 40139

––––––––––––––––

### UNITED STATES
*Appellee*

**v.**

### Deryk K. ROBERTS
Airman (E-2), U.S. Air Force, *Appellant*

––––––––––––––––

Appeal from the United States Air Force Trial Judiciary

Decided 20 January 2023

––––––––––––––––

*Military Judge:* Colin P. Eichenberger.

*Sentence:* Sentence adjudged 9 April 2021 by GCM convened at Nellis Air Force Base, Nevada. Sentence entered by military judge on 16 July 2021: Dishonorable discharge, confinement for 2 years, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant:* Major Kasey W. Hawkins, USAF; Carol A. Thompson, Esquire.

*For Appellee:* Lieutenant Colonel Thomas J. Alford, USAF; Major John P. Patera, USAF; Major Brittany M. Speirs, USAF; Mary Ellen Payne, Esquire.

Before POSCH, MERRIAM, and CADOTTE, *Appellate Military Judges*.

Judge MERRIAM delivered the opinion of the court, in which Senior Judge POSCH and Judge CADOTTE joined.

––––––––––––––––

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

––––––––––––––––

MERRIAM, Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1,2] Appellant elected to be sentenced by military judge alone. The adjudged sentence was a dishonorable discharge, confinement for two years, total forfeiture of pay and allowances, and reduction to the grade of E-1. Appellant requested clemency, but the convening authority took no action on the findings or sentence and the military judge entered judgment as adjudged.

Appellant asserts three assignments of error on appeal: (1) the evidence is legally and factually insufficient to sustain the conviction; (2) trial counsel committed prosecutorial misconduct during findings argument; and (3) the military judge erred by failing to instruct the court-martial panel that a guilty verdict must be unanimous and the Government cannot prove beyond a reasonable doubt that this error was harmless. Finding no error that materially prejudiced a substantial right of Appellant, and finding the conviction legally and factually sufficient, we affirm the findings and sentence.

## I. BACKGROUND

CB, an active duty Air Force member and the victim in this case, initially met Appellant during basic training. Appellant was then among a group of CB's friends in technical training at Joint Base San Antonio–Lackland, Texas, a group that also included PO[3] and AC. During weekend breaks, the group would spend time socializing in the dorms and at a local club. Although Appellant showed romantic interest in CB toward the end of technical training, CB's relationship with Appellant remained strictly a "friendship." Based on her interactions with Appellant during training, CB believed Appellant "seemed like somebody [she] could trust." Both CB and Appellant were to be stationed at

---

[1] All references in this opinion to the UCMJ and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*).

[2] Appellant was convicted of sexual assault for penetrating CB's vulva with his penis. The court-martial also convicted Appellant of four other specifications of violating Article 120, UCMJ. After findings, the military judge dismissed these additional specifications, relating to the same course of conduct and victim, "conditioned on ultimate approval of appellate review of the finding of guilty" of the specification of which Appellant was convicted and that is the subject of this appeal.

[3] Appellant was also charged with committing two sexual assaults and an assault consummated by battery against PO. The court-martial acquitted Appellant of all specifications related to PO.

Nellis Air Force Base, Nevada, for their first assignments after technical training concluded. CB and Appellant communicated via FaceTime, where they discussed socializing and meeting again in the future. CB's testimony at Appellant's court-martial provided the following facts.

Appellant arrived at Nellis Air Force Base in November 2019, and CB arrived on 13 December 2019. The day after she arrived at the base, CB met Appellant and the two "just hung out." Over the next week, the two explored the local area, to include visiting the Las Vegas Strip and a shopping mall. CB and Appellant also spent time together in Appellant's room. Eventually, CB and Appellant engaged in consensual kissing, which included Appellant kissing CB's exposed breasts. Although CB was not interested in a relationship with Appellant, she engaged in the consensual kissing because she "felt lonely" and to fill a "void" from "not knowing that many people." Notwithstanding these activities, CB "still thought of [Appellant] as a friend."

On 20 December 2019, after taking a nap with Appellant in his dorm room, the two awoke and began consensual kissing, which again led to Appellant kissing CB's breasts. Unexpectedly, Appellant exposed his penis and asked CB "will you give me head?" CB told Appellant "no" and "that [she] didn't want to do things of that nature and expressed that . . . [she] didn't want to do that stuff with somebody who wasn't [her] boyfriend." With his pants still down, Appellant "kept asking [CB] why" she would not perform oral sex, so CB informed Appellant she had been sexually assaulted in the past. Appellant "responded empathetically" and eventually pulled up his pants. The two then proceeded together to a mutual friend's room.

At their friend's dorm room, CB and Appellant socialized with several other Airmen. CB consumed a portion of one mixed drink but did not drink any more since she was not feeling well even before drinking and did not want to upset her stomach even more. CB testified she did not feel any effects of the alcohol. Because she "still wasn't feeling great," CB decided to leave the gathering alone.

Upon arriving at her dorm room, CB changed into sleeping clothes and then text messaged Appellant, inviting him to her room. Specifically, CB texted, "Sleep in my dorm room." When Appellant queried who was in her room, CB replied "No[ ]one" and "Bring a pillow." CB testified she extended this invitation because she "was still just feeling lonely and . . . didn't want to sleep alone that night." Not long after her invitation, Appellant arrived at CB's dorm room. Initially, the two sat and "talked about different things." Appellant then asked CB why she invited him to her room, and CB stated that she "felt lonely and . . . didn't want to sleep alone, and [when Appellant] asked what [her] intentions were . . . [she] said that [she] didn't want to have sex that night." CB

felt the need to tell Appellant that she did not want to engage in sexual intercourse because, in her telling, she "knew [by] inviting him over someone might get the idea that -- sleeping overnight someone might get the idea that someone might want to have sex with them, so [she] wanted to just make it clear right then and there."

CB and Appellant then "got into bed and . . . [eventually] started kissing." CB was still comfortable with kissing since the two "had already done it and it didn't feel like anything uncomfortable." However, while CB laid on her back, Appellant began attempting to pull down CB's pants. In response, CB held onto her pants, "trying to hold them from being able to [be] pull[ed] . . . down." CB told Appellant she "didn't want to go any further with anything." Appellant continued his attempt to pull down her pants and, frustrated, CB again told Appellant "to stop." Appellant "asked why [she] was resisting," and she once again told him that she did not want to have sex or engage in any other intimate activities with Appellant. Appellant asked CB if he could perform oral sex on her, but she said "no." CB repeatedly told Appellant both "no" and "stop."

Once Appellant succeeded in pulling down CB's pants, CB placed her hands over her vagina, but Appellant grabbed her wrists, put her hands to the side, and performed oral sex on her. As Appellant continued, CB felt nervous and scared, and "didn't feel like [she] had any options." CB also worried that, if she fought back, she could "get . . . physically hurt." Appellant continued performing oral sex on her, and, taking one of his hands from one of her wrists, began digitally penetrating her vagina. CB continued to tell him "no, stop." Eventually Appellant began to remove his pants and CB told him not to because she did not want to have sex. Ignoring CB's pleas, Appellant "leaned up and pulled his pants down to about where he could, where his penis was out." Again, CB told Appellant "I don't want to have sex" and "stop." CB placed her "hands over [her] vagina before he was going to penetrate" her. Appellant nonetheless "leaned in to put his penis in [her] vagina." CB testified that during the encounter, the penetration felt painful and uncomfortable and she told Appellant "it hurt."

Appellant repositioned CB so that she was on her knees, and he began penetrating her from behind. CB "was still in pain" and loudly told Appellant to "stop." Appellant "reached his hand forward and covered [CB's] mouth, and then after that, [the sex] eventually stopped and he asked if [CB] would perform oral sex" on him. CB told Appellant she "didn't want to give him oral sex [but Appellant] said that [she] would leave him with blue balls." CB responded that she "didn't care" and further testified "it just w[ent] on like that for a little bit of him saying why or like asking [her] to and [her] saying [she] didn't want to." Eventually, because CB wanted "[i]t all to be over," "just wanted to go to

sleep," and felt like she had no choice, she briefly performed oral sex on Appellant. CB stopped because she "still didn't want to do it." Appellant then masturbated to orgasm. After he finished, he got up and used the bathroom, and CB pulled her clothes back on. CB was "[r]elieved that it was over." Though CB was still "in disbelief" about what had just occurred, Appellant and CB eventually fell asleep on CB's bed.

The next day, on 21 December 2019, Appellant and CB ate lunch together, along with AT. At that time, CB "hadn't come to terms with the events that took place" the night prior. Later that day, Appellant invited CB to his room by text message. CB went to Appellant's room, where CB and Appellant eventually kissed until CB again "expressed that [she] didn't want to [go any further] and then [she] also told [Appellant] how [she] didn't want to [have sex] the night prior." The two eventually left Appellant's room and went to AT's room, where they watched a movie with AT, during which time Appellant laid his head on CB's lap and CB stroked Appellant's hair and rubbed his shoulders. After the movie ended, CB and Appellant each returned to their own rooms alone.

Later, on a date CB could not recall at trial, Appellant appeared at CB's dorm room. When Appellant entered her room, CB "broke down" and told Appellant that she "wasn't ready to talk about" the sexual assault. When Appellant asked her why she was crying, CB told him that "he really hurt" her. Appellant "apologized and then just left [her] room." A bit later, when she was ready to discuss the incident, CB walked to Appellant's room and told him she was upset about what Appellant had done. Appellant responded that she "wasn't going to sit there and . . . accuse him of raping [her]." Given Appellant's reaction, and because his reaction made her feel "[d]egraded, [b]elittled, [and u]pset," CB left Appellant's room.

In the days after the incident, CB told her friend AC about the sexual assault. On 22 December 2019, CB also told PO about the incident. PO told CB that "[s]he understood the way [CB] felt and [that she] felt empathy for [CB] and was sorry." When CB later saw that PO was socializing with Appellant after CB had told her about the sexual assault, CB became upset because she "wasn't expecting [PO] to be hanging out with him after [she] told her what had happened." CB testified that seeing Appellant and PO together did not make her jealous, but it did bring back many of the emotions she felt with respect to Appellant—"fear," being "scared," and being "upset."

In early January 2020, CB filed a restricted report at the local Sexual Assault Prevention and Response Office. After PO told CB that Appellant engaged in unwanted sexual conduct with her as well,[4] CB decided to change her report from a restricted to an unrestricted report. On 8 January 2020, CB provided the Air Force Office of Special Investigations (AFOSI) a full account of the sexual assault. At trial, part of AFOSI's recording of CB's interview was admitted as a prior consistent statement and played by the Government during its case-in-chief.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Contrary to Appellant's pleas, the court-martial found Appellant guilty of one specification of sexual assault, in violation of Article 120,[5] UCMJ. Appellant contends the evidence supporting his conviction is legally and factually insufficient. We disagree.

#### 1. Law

A Court of Criminal Appeals may affirm only such findings of guilty as it "finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(d), UCMJ, 10 U.S.C. § 866(d). "Article 66[ ] requires the Courts of Criminal Appeals to conduct a de novo review of legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (emphasis and citation omitted). Our assessment is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citation omitted). In resolving questions of legal sufficiency, we are bound to "draw every reasonable inference from the evidence of record in favor of the prosecution." *Robinson*, 77 M.J. at 298 (alteration omitted) (quoting *United States v. Plant*, 74 M.J. 297,

---

[4] As noted above, the court-martial acquitted Appellant of all charged offenses related to PO.

[5] As noted above, the court-martial convicted Appellant of several additional specifications, each of which was conditionally dismissed by the military judge after findings.

301 (C.A.A.F. 2015)); *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). To conclude the evidence is factually sufficient "does not mean that the evidence must be free of conflict." *United States v. Galchick*, 52 M.J. 815, 818 (A.F. Ct. Crim. App. 2000) (citation omitted). The Government may meet its burden to prove each element beyond a reasonable doubt through testimony of only one witness "so long as the members find that the witness's testimony is relevant and is sufficiently credible." *United States v. Rodriguez-Rivera*, 63 M.J. 372, 383 (C.A.A.F. 2006) (citations omitted).

Appellant was convicted of sexual assault without consent. The elements of this offense are: (1) that Appellant committed a sexual act upon another person; and (2) that Appellant did so without the consent of the other person. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM)*, pt. IV, ¶ 60.b.(2)(d).

"Sexual act" means, *inter alia,* "the penetration, however slight, of the penis into the vulva or anus or mouth." *MCM,* pt. IV, ¶ 60.a.(g)(1)(A).

"Consent" means

> a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent. Submission resulting from the use of force, threat of force, or placing another person in fear also does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue does not constitute consent.

*MCM,* pt. IV, ¶ 60.a.(g)(7)(A).

The defense of mistake of fact as to consent would apply if Appellant, because of ignorance or mistake, incorrectly believed that CB consented to the sexual act. *See* Rule for Courts-Martial 916(j)(1). To rely on mistake of fact as to consent as a defense, Appellant's belief must be reasonable under all the

circumstances. *See id.*; *see generally United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998).

## 2. Analysis

Appellant's argument that his conviction is legally and factually insufficient focuses on CB's veracity. Appellant argues CB "fabricated the non-consensual encounter" and that because there is a reasonable explanation for CB's claim other than Appellant's guilt, his conviction cannot be sustained. Finally, Appellant asserts he had a reasonable mistake of fact as to CB's consent.

In this case, there was sufficient evidence to establish the essential elements of sexual assault beyond a reasonable doubt. At trial, CB's testimony alone was sufficient to establish proof of the two elements necessary for the charge. CB testified that Appellant penetrated her vagina with his penis, and that he did so without her consent. In fact, according to her testimony, she directly and repeatedly manifested her lack of consent in multiple ways, including by attempting to pull her pants back up as Appellant was pulling them down, telling him to stop, telling him that she did not want to have sex with him, and by twice attempting to physically cover her vagina with her hands.

Appellant contends "[a] significant amount of evidence indicates" that CB "fabricated the non-consensual encounter." Appellant's arguments are premised on a few theories. First, Appellant contends it was "clear [CB] viewed [Appellant] as a boyfriend, and she felt betrayed when he simultaneously pursued her friend." However, CB testified that she did not view Appellant as more than a friend. Indeed, her view of him as not more than friends caused her to repeatedly deny Appellant's sexual advances beyond the kissing with which she was comfortable. Moreover, CB testified that she was upset upon learning that Appellant had pursued a friend, not out of jealousy, but out of frustration that the friend appeared interested in Appellant despite knowing Appellant had sexually assaulted CB.

Second, Appellant asserts that every other time Appellant and CB began engaging in physically intimate activity, Appellant stopped when CB told him to. Appellant contends this proves he did not "engage[ ] in non-consensual sexual intercourse" during the encounter in question. This claim ignores CB's testimony that despite the fact she had repeatedly told Appellant she did not want to progress past kissing and Appellant kissing her breasts on the morning of the assault, he spontaneously pulled out his penis and requested her to perform oral sex on him. Moreover, it is important to note that it was CB's own testimony at trial and her prior consistent statement admitted as evidence that demonstrated Appellant stopped on other occasions. Rather than attempting to bolster her report of sexual assault on the night of the incident, CB admitted that physically intimate activity on other occasions was consensual. She even

acknowledged that she did not "feel sexually assaulted" when, on a prior occasion, Appellant had placed his hand on her vagina and placed her hand on his penis without her wanting to do so. Rather than suggesting fabrication, we find CB's acknowledgement that not every physically intimate act with Appellant was non-consensual or constituted sexual assault enhances her credibility.

Appellant's contention that he had a reasonable mistake of fact defense is premised on three arguments. First, Appellant argues that CB knew that inviting Appellant to sleep in her room "would give him the impression she wanted to have sex with him." But CB explicitly disabused Appellant of that notion not long after he arrived at her room and before any sexual activity began.

Second, Appellant argues "that he could easily tell between wanted and unwanted contact," because on other occasions he respected CB's wishes and ceased pushing her for further sexual activity. In essence, this argument is that because Appellant obeyed CB's "stop signs" on other occasions, he must have obeyed them always, and she must not have put up a "stop sign" during the charged incident. We find this argument logically flawed and unconvincing.

Finally, Appellant observes that when CB confronted him about what happened Appellant was initially compassionate, but ultimately responded that he would not abide by CB accusing him of rape. Appellant claims this indicates he must have honestly believed CB consented. As with his other contentions on this point, Appellant's argument is unavailing. The fact that after the incident Appellant was at first compassionate and then rejected any insinuation that he sexually assaulted CB does little to demonstrate that he was subjectively mistaken about her consent or that any such mistake was reasonable. In contrast, there is substantial evidence demonstrating that no person could reasonably believe CB was consenting. CB told Appellant before the sexual assault occurred that she did not want to have sex with him, and then she repeatedly protested verbally and physically after Appellant moved beyond kissing to activity to which she did not consent. The Government proved beyond a reasonable doubt that Appellant was not reasonably mistaken; he knew CB was not consenting to the sexual activity.

After viewing the evidence in the light most favorable to the Government, a rational trier of fact could have found Appellant guilty beyond a reasonable doubt of each element of the offense of sexual assault without consent and could have found beyond a reasonable doubt Appellant was not reasonably mistaken as to consent. *Robinson*, 77 M.J. at 297–98; *Dykes*, 38 M.J. at 272. Moreover, having weighed the evidence in the record and having made allowances for not having personally observed the witnesses in this case, we are convinced of Appellant's guilt beyond a reasonable doubt. *Wheeler*, 76 M.J. at 568. Thus, we find Appellant's conviction is legally and factually sufficient.

## B. Prosecutorial Misconduct

### 1. Additional Background

Appellant asserts that trial counsel's arguments were "riddled with acts of misconduct." Specifically, Appellant asserts trial counsel (1) argued facts not in evidence—that is, that trial counsel improperly claimed Appellant used "force" against CB during the sexual encounter; (2) tried to get the members to put themselves in the place of CB by asking the members to contemplate the best way for them to react if they too were being sexually assaulted; (3) vouched for CB's veracity by saying it is impossible to emulate trauma and that if CB was lying, she is the best actress the government counsel—or the members—has ever seen; and (4) insinuated that had Appellant only apologized to CB when they first spoke, he would not have been prosecuted. At trial, defense counsel objected to none of these comments, which Appellant now contends were "acts of misconduct."

### 2. Law

Assertions of prosecutorial misconduct and improper argument, including whether trial counsel's comments in closing argument improperly reference an accused's constitutional right to remain silent, are reviewed de novo. *See United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018); *United States v. Flores*, 69 M.J. 366, 369 (C.A.A.F. 2011) (citation omitted).

"If proper objection is made [at trial], we review for prejudicial error." *Andrews*, 77 M.J. at 398 (citing *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005)). If no objection is made, Appellant has forfeited his right to appeal and we review for plain error. *See id.* "Plain error occurs when (1) there is error, (2) the error is clear or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *Id.* at 401 (quoting *Fletcher*, 62 M.J. at 179). Therefore, this court must determine: (1) whether trial counsel's argument amounted to clear, obvious error; and (2) if so, whether there was "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *United States v. Lopez*, 76 M.J. 151, 154 (C.A.A.F. 2017) (quoting *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016)); *see also United States v. Tovarchavez*, 78 M.J. 458 (C.A.A.F. 2019) (explaining that, where non-constitutional error is forfeited, the *Molina-Martinez* test applies). "The burden of proof under plain error review is on the appellant." *Andrews*, 77 M.J. at 398 (citing *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017)). However, "[r]egardless of whether there was an objection or not, '[i]n the context of a constitutional error, the burden is on the Government to establish that the comments were harmless beyond a reasonable doubt.'" *Flores*, 69 M.J. at 369 (second alteration in original) (quoting *United States v. Carter*, 61 M.J. 30, 35 (C.A.A.F. 2005)).

Prosecutorial misconduct is "action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citations omitted).

Argument by trial counsel "must be viewed within the context of the entire court-martial." *United States v Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000) (citing *United States v. Young*, 470 U.S. 1, 16 (1985)). "The focus of our inquiry should not be on words in isolation, but on the argument as viewed in context." *Id.* (internal quotation marks and citations omitted). Trial counsel may make "vigorous arguments . . . based on a fair reading of the record." *United States v. Kropf*, 39 M.J. 107, 108 (C.M.A. 1994) (citations omitted). "A criminal trial is not a tea dance, but an adversary proceeding to arrive at the truth. Both sides may forcefully urge their positions so long as they are supported by the evidence." *United States v. Rodriguez*, 28 M.J. 1016, 1023 (A.F.C.M.R. 1989), *aff'd*, 31 M.J. 150 (C.M.A. 1990).

"It is black letter law that a trial counsel may not comment directly, indirectly, or by innuendo, on the fact that an accused did not testify in his defense." *United States v. Mobley*, 31 M.J. 273, 279 (C.M.A. 1990) (citing *Griffin v. California*, 380 U.S. 609 (1965)). As the United States Supreme Court has observed:

> It is one thing to hold . . . that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge . . . that the same reasoning would forbid the prosecutor from fairly responding to an argument of the defendant by adverting to that silence.

*United States v. Robinson*, 485 U.S. 25, 33–34, (1988) (characterizing language in *Griffin* that "the Fifth Amendment[6] 'forbids . . . comment by the prosecution on the accused's silence'" as "broad dicta" (omission in original) (quoting *Griffin,* 380 U.S. at 615)).

"If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced counsel are occasionally carried away by this temptation." *Dunlop v. United States*, 165 U.S. 486, 498 (1897).

"Golden Rule arguments asking the members to put themselves in the victim's place are improper and impermissible in the military justice system." *Baer*, 53 M.J. at 238. However, "an argument asking the members to imagine

---

[6] U.S. CONST. amend. V.

the victim's fear, pain, terror, and anguish is permissible, since it is simply asking the members to consider victim impact evidence." *Id.* (citation omitted). "Logically speaking, asking the members to consider the fear and pain of the victim is conceptually different from asking them to put themselves in the victim's place." *Id.* (citation omitted).

It is improper for a trial counsel to interject himself or herself into the proceedings by expressing a "personal belief or opinion as to the truth or falsity of any testimony or evidence." *Fletcher*, 62 M.J. at 179 (citations omitted). "There are many ways a trial counsel might violate the rule against expressing a personal belief or opinion." *Id.* at 180. "One is by giving personal assurances that the Government's witnesses are telling the truth." *Id.* (citing *Young*, 470 U.S. at 18–19). "Another is by offering substantive commentary on the truth or falsity of the testimony and evidence." *Id.* (citing *Young*, 470 U.S. at 8). Trial counsel cannot "place[ ] the prestige of the government behind a witness through personal assurances of the witness's veracity." *Id.* (quoting *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993)).

**3. Analysis**

We address each of Appellant's four arguments of prosecutorial misconduct, beginning with Appellant's assertion of constitutional error.

Appellant claims trial counsel insinuated that had Appellant apologized to CB when they first spoke about the incident, Appellant would not have been prosecuted, and that this insinuation constituted an impermissible comment on Appellant's right to remain silent. On this point, Appellant provides no specific citation to language in trial counsel's argument.[7]

A major theme of trial defense counsel's findings argument was that CB fabricated the non-consensual nature of her interaction with Appellant and reported the sexual assault only after she discovered that Appellant was romantically interested in another woman. In offering an explanation for CB's post-assault behavior and ultimate decision to report the sexual assault, trial counsel stated in his rebuttal argument:

> [W]hen she goes to [Appellant] to talk about it, she thinks maybe I can salvage, you know, a couple days later, not the relationship, but salvage the fact that he needs to know what he did to me. And, members, maybe, in that moment, if he had understood and he's like, oh my God, I'm so sorry, I didn't know; like, you know, it got away from me, I was wrong, I was absolutely wrong, you're right, you said no and I kept going and I was wrong, how can I

---

[7] Indeed, Appellant omits specific citation in both his original assignments of error brief and, after the Government noted the lack of citation in its answer, in his reply.

> make this up to you. Maybe if that had happened, it doesn't make it right, but she might not have come, who knows. Maybe that's what she was looking for at the moment, to reconcile that she didn't have to go to [AF]OSI and become this victim.

This explanation for the victim's mindset and actions, offered by trial counsel to rebut trial defense counsel's assertion that the victim had fabricated the sexual assault, is a far cry from commenting on Appellant's constitutional right to remain silent. Trial counsel was describing the evolution of CB's understanding that she was a victim of sexual assault and, briefly, her thought process in deciding to report Appellant's crimes. Trial counsel made this argument in rebuttal, responding to trial defense counsel's characterization of CB's testimony as a "completely absurd timeline of events."

The crux of Appellant's argument on appeal is that trial counsel insinuated that "had [Appellant] only apologized to [CB], when they first spoke, he would not have been prosecuted." Appellant reiterates, "Essentially, the trial counsel said that [Appellant's] failure to provide an explanation and apology for his behavior is not only a solid reason for [CB] to file an unrestricted report, but for the [G]overnment to bring charges." This is neither what trial counsel said, nor a reasonable implication, when trial counsel suggested that had Appellant apologized the victim may not have reported the assault because she may not have felt like a victim.

Trial counsel did not suggest Appellant had any responsibility or affirmative obligation to admit his guilt to CB, much less to the Government or the court-martial. When CB confronted Appellant, she was not acting as an agent of the Government and neither trial counsel and no one else at trial suggested otherwise. Rather, trial counsel suggested why CB may have felt less like a victim had Appellant acknowledged what he did to her. Trial counsel's implication that CB chose to report the sexual assault sometime after Appellant failed to acknowledge to her what occurred was not suggesting, explicitly or implicitly, that Appellant should have admitted his crimes to the Government before trial or to the court-martial during trial. Under the circumstances, Appellant's failure to apologize to CB prior to her ever reporting the incident had nothing at all to do with his constitutional right to remain silent.

Trial counsel's comment clearly occurred in the context of rebutting trial defense counsel's attack on CB's credibility due to the timing of her post-assault actions. Further, trial counsel's comment was isolated, and did not approach the pervasive nature of the impermissible comments by trial counsel in *Carter*, the lone case cited by Appellant for this assertion of prosecutorial misconduct. In that case, our superior court found plain error where trial counsel characterized the complaining witness's account as "uncontroverted" and "uncontradicted" eleven times during argument, in a case where only the accused

could be in possession of contradictory evidence "such that the reference to [accused's] decision not to testify became a centerpiece of the closing argument." *Carter,* 61 M.J. at 34. By contrast, in this case, trial counsel's comment was in the context of "a fair response to the defense's theory of the case." *See id*. at 33. We do not find error in trial counsel's comment about Appellant's refusal to apologize and therefore we need not assess whether the comment materially prejudiced Appellant's substantial rights.

Second, Appellant asserts trial counsel argued facts not in evidence when he referenced "force."[8] Trial counsel referenced "force" three times in closing argument. First, trial counsel argued CB "submitted to [Appellant's] force and she gave him oral sex." Later, trial counsel asked rhetorically

> is her submission to the force, submission to the accused penetrating her, from in front, from behind, putting his mouth on her vagina, touching her without . . . with her resistance; and, then, ultimately, submitting when he says, now, I have blue balls, let's just get this over with, I need to get this done, let me put my penis in your mouth? Now, is that submission consent?

Trial counsel followed by quoting the military judge's instructions, noting that "[s]ubmission resulting from the use of force, threat of force, or placing another person in fear also does not constitute consent." Finally, trial counsel later reiterated CB "succumbed to [Appellant's] force and she put her mouth on his penis." Appellant argues these references to force were arguing facts not in evidence. But evidence of force was admitted at trial.

In the context of Article 120, "force" includes "the use of such physical strength or violence as is sufficient to overcome, restrain, or injure a person" and "inflicting physical harm sufficient to coerce or compel submission by the victim." *MCM,* pt. IV, ¶ 60.a.(g)(4)(B)–(C). CB admitted Appellant did not "physically force" her to perform oral sex on him. But CB also testified that earlier during the same sexual encounter Appellant had pulled down her pants while she unsuccessfully struggled to pull them back up and that "he grabbed [her] wrists and put [her] hands to the side and got [her] pants down . . . and started to perform oral sex on [her] vagina" while he was on top of her. She testified she "had put [her] hands over [her] vagina before [Appellant] was going to penetrate [her]," but that Appellant "just went into, like he leaned in to

---

[8] We note that regarding the misconduct to which trial counsel was referring in this portion of the argument Appellant was charged and convicted of sexual assault by lack of consent, not with rape or aggravated sexual assault by force. However, force is directly relevant to lack of consent. *See MCM,* pt. IV, ¶ 60.a.(g)(7)(A) ("Submission resulting from the use of force, threat of force, or placing another person in fear . . . does not constitute consent.").

put his penis in [her] vagina." She testified that she told Appellant the penetration hurt. Additionally, in her prior consistent statement made to AFOSI agents and admitted substantively at trial, CB stated she told Appellant: "I told you I didn't want to have sex with you, and then you made me feel like I had no choice, and at times you literally forced me." In summary, evidence was admitted of multiple instances of force during the encounter in which CB ultimately submitted to performing oral sex on Appellant.

Under the circumstances, trial counsel's brief references to force were not erroneous assertions of facts, but rather characterization of the events that transpired during the charged incident. Because we find these comments did not constitute clear, obvious error, we need not determine whether there is a reasonable probability the comments affected the outcome of the proceeding. *Lopez*, 76 M.J. at 154.

Third, Appellant contends trial counsel made a prohibited "Golden Rule" argument when he "tried to get the members to put themselves in the place of [CB] by asking the members to contemplate the best way for them to react if they too were being sexually assaulted." Appellant does not cite what specific language in trial counsel's argument asked the members to put themselves in CB's place. Appellant cites only a page of the trial transcript containing a portion of trial counsel's findings argument in which, in anticipation of a series of theories he expected the Defense might raise, trial counsel was attempting to explain CB's lack of significant physical resistance to Appellant's assault:

> Lack of physical resistance . . . you might say, why didn't she punch him, why didn't she kick him? And the defense might say, she could have run away. Hey, the door was to your back, why didn't you just run away? Why didn't she punch back? That's what we all want to do. In a traumatic situation, when you're assaulted, a natural thought is I would be . . . I would be a hero in that moment. I would be the person who, despite what really happened and what you see happens in this case, I would be the one to fight back. A bank is robbed and if someone had a gun, I would be the one to run towards that gun and save everyone, save myself. No, you freeze. It's human nature, you freeze, you stop, and you think to yourself what is happening to me because you don't know, even in those milliseconds, how do you even comprehend that a person who you're so close to, who's a friend from tech school, the Air Force helped build that relationship, has now turned and is about to do what he's about to do?

(Ellipses in original).

Though trial counsel somewhat confusingly mixed pronouns during this line of argument, referencing both the first and second person, this series of questions and observations was not an invitation to the members to put themselves in CB's place or to imagine they had been sexually assaulted. Instead, trial counsel was observing that it is common for people to assume that they might react one way, but then react differently when faced with a traumatic situation.

Comparison of trial counsel's argument in this case with the *Baer* case cited by Appellant in support of his argument is instructive. In that case, our superior court found trial counsel engaged in impermissible argument when he told the members, "Imagine being [the victim] sitting there as these people are beating him," and "Just imagine the pain and the agony. Imagine the helplessness and terror." *Baer*, 53 M.J. at 237. By contrast, trial counsel's argument in this case could be fairly summarized as suggesting the members *not* put themselves in CB's position—that is, that they not make the mistake of assuming they know how CB should have acted or how they would react under traumatic circumstances. In the specific circumstances of this case, we do not find these comments constituted clear, obvious error. Even if we were to find them to be error, in the context of the entire argument, the direction, tone, and theme of the trial counsel's comments about how one might react to an assault or other traumatic situation were not calculated to inflame the members' passions or possible prejudices. *Id.* at 238. Appellant has not demonstrated a reasonable probability the comments affected the outcome of the proceeding. *Lopez*, 76 M.J. at 154.

Finally, Appellant asserts trial counsel engaged in improper vouching for CB's veracity when he said the following during rebuttal argument:

> [Y]ou saw the sincerity in those two young ladies. And this is all made up? Everything here is made up? Then, those two girls are in the wrong profession, because they need to go . . . become the best actresses I've ever seen and you've ever seen. You can't emulate trauma. You can't emulate the truth.

(Ellipses in original). Trial counsel's argument that the two complaining witnesses were either telling the truth or were great actors in the making was a comment on the quality and credibility of the testimony the panel members had observed, not a personal assurance of the witnesses' veracity or an attempt to place the prestige of the Government behind the witnesses. Even if we were to find the "best actresses I've ever seen" comment to be clear or obvious error, Appellant has not demonstrated a reasonable probability the comments affected the outcome of the proceeding. *Id.* Indeed, it would be difficult for Appellant to do so. The members acquitted Appellant of all specifications relating

to one of the two witnesses to whom trial counsel was referring, strongly suggesting the members disregarded trial counsel's implied assertion that she must have been telling the truth.

## C. Unanimous Verdict

We have considered Appellant's contention that the United States Constitution guarantees him the right to a unanimous verdict,[9] a right not reflected in the current court-martial framework. We find this assertion of error warrants neither further discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence are **AFFIRMED.**

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[9] Appellant asserts this right as an error by the military judge in failing to advise the panel members that a unanimous verdict was required.